LEWIS E. AND DARLENE D. SWAYZE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Swayze v. Commissioner
Docket No. 11944-81.
United States Tax Court
T.C. Memo 1983-168; 1983 Tax Ct. Memo LEXIS 621; 45 T.C.M. (CCH) 1104; T.C.M. (RIA) 83168; March 29, 1983. Barbara J. Rose, for the petitioners. Ralph W. Jones, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Sec. 6653(a),
I.R.C. 1954
Year
Deficiency
Addition to Tax
1977
$270
$13.50
1978
4,280
214.00
1979
4,313
215.65
The issues for decision are: [1]
1. Whether petitioners are properly taxable on certain income earned by their sole proprietorships but transferred to the Lewis and Darlene Swayze Trust; 2. Whether certain income and expense items reported by the trust should instead have been included by petitioners on their individual tax returns; 3. Whether petitioners are entitled to a deduction under section 212[2] for the cost of a package of materials purchased from the Institute of Individual Religious Studies for the creation of the trust; 4. Whether petitioners are entitled *624 to certain other adjustments to their income, including an investment tax credit for the purchase of a business copier; and 5. Whether any part of the underpayments of income tax for 1977, 1978, and 1979 was due to negligence or intentional disregard of the tax laws within the meaning of section 6653(a). FINDINGS OF FACT Petitioners Lewis E. Swayze and Darlene D. Swayze, husband and wife, were legal residents of Portland, Oregon, when they filed their petition. They filed joint Federal income tax returns for 1977, 1978, and 1979 with the Ogden Service Center, Ogden, Utah. In addition, they filed U.S. Fiduciary Income Tax Returns for the Lewis and Darlene Swayze Trust (hereinafter the trust) for 1978 and 1979. For *625 some years prior to 1977 and continuing through 1979, Lewis E. Swayze (hereinafter Lewis) conducted as a sole proprietorship a business called Oregon Financial Planners. In connection with this business, he was a certified financial planner licensed by the State of Oregon, and was also licensed as an insurance salesman and a securities broker. Darlene D. Swayze (hereinafter Darlene) was engaged in income tax return preparation under the name of Darlene Swayze Income Tax Service and was licensed to prepare Oregon State income tax returns. As part of their businesses, petitioners promoted, sold and received commissions on the sale of family trust packages provided by the Institute of Individual Religious Studies (IOIRS). After Lewis sold a trust package, Darlene provided income tax and accounting services to the purchasers. After consulting with an attorney, petitioners executed a somewhat modified set of the IOIRS trust documents in February 1978. These documents include an affidavit by Darlene, a declaration of trust by Lewis, minutes of the first meeting of the trustees, and minutes of the second meeting of the trustees, to which was attached an employment agreement. On *626 February 14, 1978, Darlene executed an affidavit stating that she conveyed to Lewis in trust her interest in her real and personal property, including the family residence and the furniture, fixtures, etc., therein, together with "the exclusive use of my lifetime services and all of the currently earned remuneration therefrom and from any source whatsoever but for this conveyance would be due and payable to me." The conveyance covered specifically all of her "right, title and interest in and to the income tax and bookkeeping business known as 'Darlene Swayze Income Tax Service.'" On February 15, 1978, Lewis, as trustor-creator, executed the second in this series of documents, namely a declaration of trust, in which he appointed Darlene and their son, Bruce, as trustees. The trust was to have 100 units of "Beneficial Interests". These beneficial interests were defined as "non-assessable, non-taxable, non-negotiable, but transferable." They granted their owner no personal ownership of the property or assets of the trust, but rather purportedly entitled the holder to a pro rata share of any income distributed by the trustees in their sole discretion and to a pro rata share of the *627 trust corpus on termination of the trust. At any trust meeting, a majority of the trustees was necessary to conduct "official business," and any affirmative action, including distributions made in the trustees' discretion, was to be taken only "upon a MAJORITY vote of the Trustees, whether present or by proxy." The trust was made irrevocable, not to be terminated "except through distributions permitted by this instrument"; its term of 25 years could be shortened if-- the Trustees shall unanimously determine upon an earlier date when they may at their discretion, because of threatened depreciation in values, or other good and sufficient reason necessary to protect or conserve trust assets, liquidate the assets, distribute and close the Trust * * *. According to the minutes of the first trust meeting, also dated February 15, 1978, the trust accepted Lewis' conveyance (the "Bill of Sale" is dated February 16, 1978) of real and personal property to the trust, including the family residence and all furniture, fixtures, appliances, etc., as well as the Darlene Swayze Income Tax Service, and Lewis' business known as Oregon Financial Planners. As consideration for the transfer, the *628 trustees agreed to issue to Lewis all 100 units of beneficial interests in the trust. The minutes of the second trust meeting, held on February 16, 1978, state that Lewis was made one of the trustees of the trust, and that the beneficial interests were reissued-- 20 units to Darlene and 20 each to petitioners' four sons, Roger, Bruce, Larry, and Steven. [3] On that same date, Lewis was made executive trustee and Darlene was made executive secretary of the trust. As such, they were authorized to manage the day-to-day business affairs of the trust. Minute 25 adds: 25. That the services of Lewis E. Swayze EXECUTIVE TRUSTEE of THIS TRUST and Darlene D. Swayze EXECUTIVE SECRETARY of THIS TRUST are hereby contracted for (per the provisions of Article I of the Employment Contract * * * dated February 16, 1978 * * *) from THIS DATE and for the life BY THIS TRUST subject, however, to an Annual Review by a MAJORITY of The Board of Trustees to the competency of the above named persons * * *. *629 These "services * * * contracted for" were of two types-- petitioners' duties as managers of the trust and their work as sole proprietors of their businesses, Oregon Financial Planners and the Darlene Swayze Income Tax Service. In their capacities as the managers, minute 25 provides that: This contract requires that the Managers shall reside in THIS TRUST'S HEADQUARTERS [i.e., the family residence] in order to best maintain and conserve The Trust assets. In consideration of their management services, the trust was to pay certain expenses "incident to" trust business (such as transportation and traveling), as well as life insurance and a "consultant's fee." Petitioners' second role of operating their sole proprietorships was recast in the employment agreement as follows: The Executive Trustees [petitioners] shall Continue to operate the Businesses, Darlene Swayze Income Tax Service and Oregon Financial Planners, as L & D Company * * *. The L & D Company (L & D) here referred to was a newly formed partnership, composed of Lewis and Darlene, which was set up in connection with the trust. L & D Company and the trust stated (in a document executed February 20, 1978, and *630 attached to the minutes of the second meeting) that the trust would lease to L & D the office space, buildings, furnishings and equipment needed (all of which had been transferred or assigned [4] by Lewis and Darlene to the trust); the trust would also provide all office supplies, materials, and personnel required for the operation of the businesses, perform all accounting, and supervise all billing on behalf of L & D. Although the trust was to furnish all personnel required for the operation of the business, the minutes specified: That, THIS TRUST need NOT have any employees in the sense that NO ONE will be carried on a payroll as such. That is to say, that THIS TRUST need NOT withhold State or Federal income taxes or Social Security taxes. All its executives, agents or other employees, including the Executive Trustee and the Executive Secretary, will be *631 remunerated as consultants receiving consulting fees on a contract basis, and any and all remuneration paid to them will be reported by THIS TRUST at the year end on IRS Form 1099. As consideration for the "services" performed by the trust (providing the office apparatus and personnel, etc.), L & D agreed to "pay to the Trust an amount equal to 75 per centum of the gross income of * * * [L & D] derived from the operation of the Businesses, said amounts to be computed and paid on a monthly basis." In actual operation, L & D purportedly transferred to the trust somewhat less than 75 percent of the gross income earned by Lewis and Darlene. [5] Darlene was unable to explain how the amount transferred to the trust was determined except that L & D allegedly did not have sufficient funds to transfer the full 75 percent. In *632 the months that followed, Bruce resigned as trustee and was replaced by Larry and then Bruce was reappointed as trustee. These actions were documented by preprinted forms with blanks appropriately filled in. Minutes of meetings of the trustees were also kept on preprinted forms with matters considered by the trustees typed in. The items covered by the minutes include such matters as buying a new car, remodeling the kitchen of "Trust Headquarters," installing a "new kitchen floor covering, either carpeting or vinyl," installing a wood burning stove, and buying new furnishings for the living room and a new vanity for the back bathroom.The trust also purportedly made payments on such items as the mortgage on the family residence, garden equipment and fertilizer, and a clothesline. After the trust was created, Lewis continued to operate his Oregon Financial Planners business as before, selling on a commission basis, among other things, the IOIRS packets for the creation of family trusts.On Schedule C attached to the joint 1978 and 1979 returns, he shows gross receipts or sales and total income of $12,179 and $7,645, respectively. Small deductions were claimed for such items as depreciation, *633 supplies, education seminars, licenses, and dues. In addition, a deduction for "management services" of $6,911 was claimed for 1978, leaving a net profit of $4,750; a deduction for "management fees" of $3,470 was claimed for 1979, leaving a net profit of $2,517. These management service fees were paid to the trust allegedly in consideration for its provision of office space, equipment, operating expenses, etc. After the trust was created, Darlene likewise continued to operate her Darlene Swayze Income Tax Service, doing income tax preparation work and providing accounting services for others, including customers to whom Lewis had sold the IOIRS kits. For 1978 and 1979 she reported on Schedule C gross receipts and total income of $28,896 and $38,234, respectively. Each year she claimed small amounts of deductions for seminars and education, licenses, computer service, depreciation of an automobile, and the like.In addition, for 1978, she claimed a deduction of $18,821 for "management services," leaving a net profit of $5,621, and for 1979, she claimed a deduction of $28,512 for management services, leaving a net profit of $7,865. In their joint returns for 1978 and 1979, petitioners *634 reported combined net profit as shown on the respective Schedules C as income.They also reported small amounts of income from other sources. In addition to their joint individual income tax returns, Darlene, as trustee of the trust, filed U.S. Fiduciary Income Tax Returns for 1978 and 1979. As income, these returns included the combined amounts of "management services" deductions claimed on Schedules C of the joint returns, amounting to $25,732 in 1978 and $31,982 in 1979. [6] From these income amounts certain deductions were taken, leaving taxable income (after exemption) of $3,109 in 1978 and $4,189 in 1979. These deductions included business expenses, "Administrative" expenses, such as housing expenses, utilities, telephone, and repairs (all for the family residence, the so-called trust headquarters), the trustees' medical expenses and "consultation fees," as well as depreciation on the the family house, its furnishings, and appliances. *635 OPINION By filling out and modifying the IOIRS preprinted forms, petitioners seek to split income with their family trust and to deduct, through the trust, numerous personal expenses otherwise nondeductible under section 262. Respondent argues that petitioners' efforts must fail because the steps that petitioners took constitute impermissible assignments of income, show the trust is a sham, devoid of economic reality, and violate the grantor trust provisions (secs. 671-677). We agree with respondent. We base our decision on his first and second arguments and need not address his third. The assignment of income and absence of economic reality become self-evident from a step-by-step analysis of the tortuous course of petitioners' family trust machinations. In 1977, Lewis and Darlene operated their sole proprietorships, reported income from them, and paid income taxes on their net profits; like any other individuals, they had numerous personal expenses for which no deductions were allowed by reason of the inhibitions of section 262.[7] In 1978 and 1979, however: (1) All of Darlene's interest in her business and certain property were purportedly transferred to Lewis; (2) Lewis *636 then purportedly transferred Darlene's business, his business, their house, and other property to the trust; (3) the trust in turn leased back the business assets to Lewis and Darlene through their newly formed L & D Company in exchange for 75 percent of the gross receipts of the business; (4) this percentage of their receipts, [8] supposed to have been transferred to the trust, was deducted from the taxable income of the two businesses on petitioners' individual income tax returns, thereby reducing their reported taxable income; (5) the percentage payments by L & D along with other income were used in "administering" the "trust headquarters," i.e., the family home, by providing repairs, telephone, lawn fertilizer, etc., all of which, in addition to depreciation on the family living quarters, household furnishings and goods, were deducted from the trust's income; and (6) petitioners provided "management services" to the trust--gardening, home repairs, and the like--entitling them to free rent and the payment of such personal expenses as health insurance. *637 Thus, from 1977 through 1979, Lewis and Darlene provided the same personal services in their businesses for their customers but, in 1978 and 1979, the trust, which they organized, dominated, and controlled, treated most of their business income as its income and offset much of that income with otherwise personal expenses. After all the papers were signed, creation of the trust changed nothing of consequence except, allegedly, the family's tax liabilities. But tax liabilities cannot be avoided by drawing up papers regardless of their technical elegance. As the court of appeals stated in its recent opinion in Schulz v. Commissioner,686 F.2d 490, 492 (7th Cir. 1982), affg. a Memorandum Opinion of this Court, [9] the "real question" is "which of several established doctrines the Internal Revenue Service should use" to deny the tax benefits claimed to have been created by these family trusts.
*638 Clearly, the papers that petitioners executed effected an assignment of the income which petitioners earned as individuals in their personal service businsses. They and they alone were licensed to do the work which produced the income. They and they alone earned the fees and commissions which comprised that income. The first principle of income taxation is that income must be taxed to him who earns it. Commissioner v. Culbertson,337 U.S. 733, 739-740 (1949). Regardless of the irrevocability of an assignment, income is taxed to the one who controls its earning rather than to the person or entity that ultimately receives the income. American Savings Bank v. Commissioner,56 T.C. 828 (1971); Wesenberg v. Commissioner,69 T.C. 1005 (1978); Vercio v. Commissioner,73 T.C. 1246, 1253 (1980). Petitioners are, therefore, taxable on their personal services income. Petitioners attempt to avoid a recent application of this principle in the family trust context by distinguishing the facts from those in Wesenberg v. Commissioner,supra. *639 [10] In that case, an employee of a school assigned his salary and, at his request, the school paid the salary to his trust. Holding that the assignment did not relieve the taxpayer of liability for tax on his earnings, this Court pointed out (69 T.C. at 1011) that his contract to perform services was inherently personal in nature and that it obligated him, not the trust, to perform services. Petitioners stress that an employment contract existed between L & D and the trust, not between petitioners and the trust. However, as we have emphasized, petitioners personally--not the trust or L & D--were licensed by the State of Oregon to provide the services for which their clients paid them. They earned the income. As we stated in Vercio v. Commissioner,supra, at 1254-1255, in which the taxpayer made a contract between his partnership and his family trust: In an attempt to distinguish Wesenberg, * * * [the taxpayers] made much of the fact that an employment agreement relating to * * * [the taxpayers'] services was entered into between the trust and * * * [the partnership for which the taxpayers worked]. We do not find this distinction *640 material to the resolution of the issue of control. Although this contractual arrangement may have given the trust the legal right to receive the income earned, it did not alter the fact that * * * [the taxpayer] was in control of the earnings and, as stated previously, the choice of the taxable person turns on who in fact controls the income. Lucas v. Earl,supra.[Fn. ref. omitted.] Petitioners introduced no evidence concerning L & D. They have failed utterly to show that the newly formed entity controlled their actions in any way or that the users of the services were even aware of L & D's existence. See Johnson v. United States698 F.2d 372 (9th Cir., Dec. 27, 1982); Schulz v. Commissioner,supra at 494; Vnuk v. Commissioner,621 F.2d 1318, 1320-1321, fn. 5 (8th Cir. 1980), affg. a Memorandum Opinion of this Court.; Johnson v. Commissioner,78 T.C. 882, 893 (1982). [11]
*641 More fundamentally, we think petitioners' trust lacked economic reality.[12] We acknowledge that, as a general rule, income from a trust legally created and administered may not be-- lightly attributed to the settlor outside of the statutory provisions provided by Congress in sections 671 through 677. However, when the settlor is trustee and the beneficiaries are the settlor and his family, such trust arrangements must be closely scrutinized for economic substance. Helvering v. Clifford,309 U.S. 331 (1940). [Fn. ref. omitted.] Markosian v. Commissioner,73 T.C. 1235, 1245 (1980). In the circumstances before us, we think that Lewis and Darlene retained such complete control over the trust that their paper manipulations effected no economic changes and must be disregarded. *642 We note initially certain irregularities in petitioners' treatment of the trust, which indicate to us that petitioners themselves did not consider the trust an independent entity to which they owed contractual and fiduciary obligations. For example, they did not pay the trust the full 75 percent of L & D's gross receipts as provided in their contract. They only explanation for this was that L & D did not have sufficient funds. They have not shown why this was so, given that both businesses reported small net profits (after deduction of these fees) in both years. Nor have they shown that the 75 percent of gross income that L & D was to pay the trust for petitioners' services had any reasonable relationship to anything of value provided by the trust. Moreover, the trustees apparently made no effort at any time to collect the full amounts due to the trust under the purported contract.This failure, as well as the trustees' failure to make the major "trust property," the family residence, produce income indicate derelictions of their fiduciary duties. [13] See Markosian v. Commissioner,supra at 1243. *643 While these may be technicalities, petitioners have built their case entirely on technicalities. Where they disregard the strictures imposed by their chosen form, there is no reason why that form should be respected in determining tax liabilities. See Markosian v. Commissioner,supra at 1245. Even without these technical violations, we are convinced that erection of the trust did not affect in any material manner the relationship of grantor-petitioners [14] and the property conveyed to the trust. The trust made no substantial changes in either their businesses or their household affairs. Indeed, a contrary conclusion would, we think, be utterly unrealistic--it would stretch our credulity very far to imagine taxpayers who would transfer control of the sources of their livelihood to their sons, two inexperienced and unlicensed young men in their 20's, regardless of the sons' interest or responsibility. [15] The only logical inference from the credible evidence of record is that Lewis and Darlene retained the same control over their assets and income after the erection of their paper trust as before. *644 Petitioners stress that their sons, Larry and Bruce, were both trustees and beneficiaries of the trust. Neither of these facts is persuasive. The beneficial interests were made "non-assessable, non-taxable, non-negotiable, but transferable." Indeed, so freely transferable were they that Lewis had his 100 units reissued as 50-unit portions to himself and Darlene, whereupon they both turned in their shares to be reissued in five 20-unit shares. To the extent that these units were valuable, we are convinced, after considering the testimony and demeanor of the witnesses at trial, that petitioners' sons would transfer the interests to Lewis or Darlene upon the latters' mere suggestion. And we are equally convinced that, at their parents' directive, the trustee-sons would have dutifully voted to terminate the trust. Larry and Bruce testified that they regarded their relationship with their parents' businesses and home differently after the trust was created and they were named trustees. Whereas in pretrust days Bruce helped with the businesses or stayed at the home as a son, after the trust was created he allegedly performed such acts in his capacity as a trustee.We find such testimony *645 worthy of little weight. We are convinced that, with respect to the trust, petitioners' sons were mere minions of their parents. There is no doubt in our minds that Lewis' and Darlene's directives were executed and that they and they alone controlled the trust. An entity whose existence, everyday functioning, and ultimate demise are controlled by its creators and which produces no material changes in the status quo can only be characterized as a sham, devoid of economic reality. [16]
The second issue presented concerns the deductibility, *646 under section 212(2) or (3), [17] of the cost of the trust packet of materials purchased from IOIRS. Petitioners argue that they set up the trust in an effort to conserve assets from probate costs, as well as to involve their children in their businesses "to ensure the continuation of those businesses upon their deaths." Petitioners have not shown how the trust materials served to manage, conserve, or maintain property held for the production of income for them, rather than for their heirs. Sec. 212(2); Epp v. Commissioner,78 T.C. 801, 805-806 (1982). We think that petitioners' IOIRS packets were designed to rearrange title to property and related to neither its management or conservation within the meaning of section 212(2). Epp v. Commissioner,supra at 805; Luman v. Commissioner,79 T.C. 846, 855-856 (1982). And, while advice for estate planning to reduce taxes may be deductible under section 212(3), this Court has held "that amounts paid for advice with respect to planning one's personal and family affairs, such as establishing *647 trusts for family members * * * are nondeductible personal expenditures within the meaning of section 262." Epp v. Commissioner,supra at 805. See also Luman v. Commissioner,supra at 859-860. Respondent correctly denied the deduction. Petitioners further assert entitlement to other deductions, including, in 1978, an investment tax credit allegedly passed through from the lessor of an office copier to petitioners as lessees. The evidence presented regarding the copier, however, consists only of a letter signed by the lessor's controller; this statement lacks the information required by the statute, sec. 1.48-4(f)(1) and (h), Income Tax Regs., and, therefore, *648 the investment credit may not be passed through to petitioners. [18] As for other deductions, petitioners offer no evidence other than their bare assertions in court, and we find those statements insufficient to carry their burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a).
The last issue involves petitioners' liability for additions to tax under section 6653(a). Petitioners contend that they followed the advice of an attorney (not, we note, petitioners' counsel in this proceeding) in establishing the trust and that the trust was entered into in good faith. They argue on brief that the "majority of the family equity trust cases which might conceivably have put Petitioners on some sort of notice were not decided until after the years in question, if indeed Petitioners were even aware of them." The record is clear that petitioners' actions were taken negligently or with intentional disregard of the law. Lewis and Darlene were engaged in financial planning and providing tax advice. Lewis sold *649 IOIRS packages and Darlene provided related tax services. They must have been aware of the basic principles of income tax law such as assignment of income, nondeductibility of personal expenses, and sham transactions.Their familiarity with the dubious legal effect of equity trusts is suggested, moreover, by their statement on brief that their trust was so designed as to avoid the result in Wesenberg v. Commissioner,supra.Although reliance on an attorney's advice may sometimes be a defense to negligence, Conlorez Corp. v. Commissioner,51 T.C. 467, 475 (1968), no competent lawyer could have advised petitioners to act in this manner and no intelligent financial planner or income tax preparer could have accepted such advice, if proffered, in good faith. See Hanson v. Commissioner,696 F.2d 1232 (9th Cir., Jan. 17, 1983), affg. a Memorandum Opinion of this Court, involving IOIRS packages. We agree wholeheartedly with the 8th Circuit's statement in Vnuk v. Commissioner,621 F.2d at 1321, that there is "strong support *650 for the proposition that the petitioners at a minimum should have been assessed [emphasis added]" the 5-percent additions to tax. See also sections 6653(b), 6673, 7201, 7206(1). Due to concessions, Decision will be entered under Rule 155.
Footnotes
1. Respondent has conceded that petitioners are entitled to additional annual deductions of $310.76, $1,339.92, and $648.18 for the years 1977, 1978, and 1979, respectively, and an investment tax credit of $90 for 1979. ↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. All rules references are to the Tax Court Rules of Practice and Procedure unless otherwise noted.↩
3. This reissuing was actually accomplished in two steps: First, 50 units were reissued to Darlene, then she and Lewis each had their 50 units reissued in the 20-unit blocks indicated above.↩
4. In a document dated Feb. 16, 1978, Lewis and Darlene purportedly assigned to the trust their rights as lessees in a lease, executed between themselves individually and Robert A. and Frank A. Bitar, by which petitioners rented the office space for both Oregon Financial Planners and Darlene Swayze Income Tax Service.↩
5. The actual amounts paid were as follows: Oregon Financial Planners
Year
Gross Income
Management Fee
Percent
1978
$12,179
$6,911
57
1979
$ 7,645
$3,470
45
↩
Darlene Swayze Income Tax Service
Year
Gross Income
Management Fee
Percent
1978
$28,896
$18,821
65
1979
$38,234
$28,512
75
6. The fiduciary income tax return for 1979 does not show the sources of income which comprised its gross receipts of $42,293. The amounts thereof indicate that, as in 1978, petitioners included the entire "management services" fee ($31,982) in this 1979 gross figure.↩
7. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses. ↩
8. See fn. 5, supra.↩
9. The 9th Circuit, to which this case is appealable, substantially adopted the reasoning of Schulz v. Commissioner,686 F.2d 490, 492 (7th Cir. 1982), affg. a Memorandum Opinion of this Court, in affirming a Memorandum Opinion of this Court also involving a family trust set up with preprinted IOIRS documents. Hanson v. Commissioner,696 F.2d 1232↩ (9th Cir. Jan. 17, 1983).
10. Indeed, petitioners state on brief that the agreement with the trust "was drawn up by Petitioners' attorney specifically to avoid the Wesenberg problem, in recognition that the licenses which petitioners held in carrying out their businesses were personal in nature." ↩
11. The facts here are clearly distinguishable from those in cases involving loaned-out employees. See Rubin v. Commissioner,429 F.2d 650 (2d Cir. 1970), revg. 51 T.C. 251 (1968); Fox v. Commissioner,37 B.T.A. 271 (1938); Laughton v. Commissioner,40 B.T.A. 101 (1939), remanded on other grounds 113 F.2d 103 (9th Cir. 1940). See also discussion of these cases in the context of a family trust in Johnson v. Commissioner,78 T.C. 882↩ (1982).
12. A substantial number of the trusts' deductions can be denied on a more limited ground. The so-called "administrative" expenses (including the costs of household items, home repairs, and depreciation), which petitioners allege are deductible under secs. 162 or 212, are clearly personal items under sec. 262. As petitioners have not shown how the expenses relate to either a trade or business or the production of income, the items are not deductible. As pointed out in Schulz v. Commissioner,686 F.2d at 492-493↩, the Commissioner could deny many expenses in family trust cases on this theory. Such a piecemeal attack would, however, be less efficient than a broader based examination of all of the facts to ascertain whether the trust has economic reality.
13. Minutes of a meeting dated Dec. 8, 1979, indicate that in the following year Lewis and Darlene were to pay rent of $200 per month, but no rent was apparently paid in the years before us.↩
14. Although Lewis purportedly was the sole grantor of the interests in property that he owned individually and those assigned to him the day before by Darlene, this one-day assignment must be disregarded and Darlene is to be treated as a co-grantor. Schulz v. Commissioner,686 F.2d at 496↩, relying on the substance-over-form doctrine and the fact that the parties did not treat the assignment as a sale or a gift.
15. See White v. Commissioner,T.C. Memo. 1981-73, affd. sub nom. Schulz v. Commissioner,686 F.2d 490↩ (7th Cir. 1982).
16. Petitioners allege that they had a "business purpose" in creating the trust, namely to conserve assets, avoid probate, and draw the family together to continue the "family" businesses (which, of course, petitioners alone were licensed to carry out). We find this testimony unconvincing. We see no credible evidence that the trust altered the relationships of petitioners, their sons, and their sole proprietorships. Whether its creation will be effective to reduce probate costs or to draw the family together is irrelevant to the issue here presented.↩
17. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (2) for the management, conservation, or maintenance of property held for the production of income; or (3) in connection with the determination, collection, or refund of any tax.↩
18. See Gibson v. Commissioner,T.C. Memo. 1982-342; cf. Haddock v. Commissioner,70 T.C. 511, 514↩ (1978).