686 F.2d 490
 82-2 USTC P 9485
 La Verne SCHULZ and Barbara Schulz, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
LA VERNE SCHULZ FAMILY TRUST (a Trust), Barbara Schulz,
Trustee, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Russell H. WHITE and Belva J. White, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 81-2425, 81-2424 and 81-2655.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 2, 1982.
Decided Aug. 10, 1982.
 
 Joseph W. Weigel, Weigel Law Firm, Milwaukee, Wis., for petitioners.
 Thomas M. Preston, Tax Div., Dept. of Justice, Washington, D. C., for respondent.
 Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and LEIGHTON, District Judge.*
 CUMMINGS, Chief Judge.
 
 
 1
 These appeals, which were consolidated by order of this Court, are the tip of an iceberg.[1] The common issue is the appropriate treatment, for tax purposes, of so-called family or constitutional trusts. The taxpayers contend that these are bona fide trusts taxable as such.[2] The Commissioner argues, and the Tax Court found, that they are ineffective attempts to shift the incidence of taxation by assignment of income under Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, and invalid grantor trusts under Sections 671-677 of the Internal Revenue Code, 26 U.S.C. §§ 671-677. In the Schulz cases, the taxpayers appeal deficiency findings of $5,167.08 (1972), $9,645.92 (1973), and $4,630.12 (1974); the trust (curiously) appeals the decision that it is entitled to refunds of $754 (1972) and $3,446.17 (1973).[3] In the White case, the deficiencies in the individual returns amount to $293.63 (1972), $6,964.98 (1973), and $4,564.44 (1974).[4] We affirm the Tax Court decisions in all three cases.
 
 I. The Terms of the Trusts
 
 2
 La Verne Schulz, a Wisconsin dairy farmer and real estate broker, created his trust in 1972. Into it he and his wife Barbara[5] conveyed all their real and personal property, including the farming and office equipment Mr. Schulz used to earn a living and Mrs. Schulz' right to receive her salary as an employee in the county courthouse. Everything from the dairy farm acreage to the real estate office's filing cabinets to the family's television set and toaster became the trust res. In return, the Schulzes received shares representing 100% of the beneficial interest in the trust, which they distributed to Barbara (50%), their three children (15% each), and La Verne (5%). The initial trustees were Mr. and Mrs. Schulz and Ena Lundgren, the wife of their bookkeeper; in 1976 one of the Schulzes' daughters replaced Mrs. Lundgren. The terms of the trust called for it to last for 25 years, renewable for another 25-year term with ultimate distribution to the beneficiaries or their heirs or legal representatives. Most actions could be taken by a majority of the trustees, but early termination required unanimous action. La Verne Schulz drew a salary from the trust as its consultant in running the dairy farm and real estate business he had previously conducted, and reported the salary on his individual income tax return. No distributions were made to beneficiaries. The trust paid tax on its net income-i.e., the accumulations to the trust minus the expenses of administration. In 1972 it had income of $9,321.49 and expenses of $4,930.57; in 1973 income of $25,461.96 and expenses of $11,448.69; the 1974 trust return is missing from the record. Included in the expenses of administration were such items as life insurance premiums on policies insuring La Verne Schulz ($660 in 1973); costs of maintaining and operating the family car; health care expenses for trustees ($680 in 1972 and 1973); gifts and charitable contributions ($1,100 in 1972 and 1973); license fees for a boat and a dog; educational expenses; and the cost of a home in Elkhorn, Wisconsin, allegedly maintained for the convenience of Schulz's employer, the Schulz family trust ($3,000 in 1972 and 1973).[6]
 
 
 3
 Russell White set up his family trust in the same manner and in the same year. The trust res consisted of the White family house, stocks, life insurance policies, and assorted personal property. The trust's main asset was a contract entitling it to receive the income payable to Mr. White by his employer, Litho Productions, Inc. The beneficial interests in the trust were parceled out as follows: 20% to Mrs. White, 14% to each of the Whites' five children, 10% to the Russell White Educational Fund, and nothing to Mr. White. Mr. White did, however, receive a manager's fee, determined to be whatever amounts he needed to draw from the trust. Initially the trustees were Mr. and Mrs. White and Mrs. White's brother; the brother resigned immediately after the trust was formed and was never replaced. The duration of the trust and the powers of the trustees were the same as in the Schulz family trust-a fact that is not surprising since both trusts were drafted according to instructions contained in a prepackaged kit. The tax returns of the White family trust show income of $26,532 and administration expenses of $21,694 for 1973; income of $22,935 and expenses of $16,493 for 1974; the 1972 return is not included in the record. Among the administration expenses listed separately on the returns are health expenses of the trustees ($2,600 in 1973 and 1974), "household expenses" ($5,400 in 1973 and 1974), home and car insurance ($2,200 in 1973 and 1974), and "automobile lease"-i.e., the trust's lease of the Whites' family car ($7,850 in 1973 and 1974).[7]
 
 II. The Tax Consequences of the Trusts
 
 4
 It takes no particular acumen in tax law to know that the Schulz and White family trusts cannot be treated like ordinary trusts. The only real question is which of several established doctrines the Internal Revenue Service should use to deny their existence as taxable entities.
 
 
 5
 A. Attempted deduction of personal consumption expenses
 
 
 6
 It is fundamental to our income tax regime that personal consumption expenditures-food, clothing, travel, education, entertainment-do not generate income tax deductions unless they are somehow inextricably linked to the production of income.[8] When taxpayers buy cars, travel, or take out life insurance policies, they make those expenditures out of after-tax dollars. The trust devices here are a transparent attempt to alter that state of affairs by turning all the families' activities into trust activities and all the families' expenses into expenses of trust administration. If this device worked, the Schulzes and the Whites would, unlike the rest of us, make all their consumptive expenditures with pre-tax dollars.
 
 
 7
 The Internal Revenue Service could disallow most of the administration expenses claimed in these family trust returns. But such an approach would be extremely inefficient; the Service does not have the resources to audit every return, and the chance of avoiding an audit would only encourage this form of tax evasion.
 
 B. Anticipatory assignment of income
 
 8
 A broader-based attack on family trusts of the type described here is possible. Since the seminal case of Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, it has been clear that income is taxed to the person who earns it, regardless of what arrangements he makes to divert the payment of it elsewhere.[9] This is a rule of imputation that has nothing to do with, and does not affect, the validity of the particular arrangement for purposes other than computing income taxes.[10] In the absence of such an imputation rule, taxpayers would be able to defeat the progressivity of the income tax rate structure by directing income to low-bracket recipients. That result would obviously have occurred if Mr. White's or Mr. Schulz' income had actually been distributed to their respective children and wives; but the potential deflation of the brackets exists even where-as here-there has been no distribution to the trust beneficiaries. The impact on progressivity is only postponed, owing to a special feature of trust taxation. Although the trust pays taxes on accumulated, undistributed income as if it were an individual taxpayer,[11] when accumulated income is finally distributed to the trust beneficiaries (at the latest, when these trusts terminate), it is taxed to the beneficiary as if it had been distributed in the year it was accumulated, and the taxes previously collected from the trust are credited to the beneficiaries' tax bills. The result is that only the beneficiary is taxed ultimately and substantial tax deferral has been achieved.[12] Thus Earl 's concern to prevent end-runs around the progressive income tax rate structure is equally implicated in these family trusts, whether there are annual distributions or only a final termination of the trust.
 
 
 9
 Under the rationale of Earl, it is a distinction without a difference that Russell White was a salaried employee and La Verne Schulz was self-employed before the creation of the trusts. In either case, the income is spread so that no one is taxed at the higher marginal rates on the full amount. But Russell White's status as an employee of Litho Productions has encouraged him to make an argument that he is a "leased employee," governed by a set of tax precedents distinct from Earl and its progeny. In the true "leased employee" cases, an employee is under a legal duty to provide services to a corporation (or trust) and the corporation (or trust) is taxed on the income the employee's services produce. See, e.g., Rubin v. Commissioner, 429 F.2d 650 (2d Cir. 1970); Laughlin v. Commissioner, 40 B.T.A. 101 (1938), rev'd on other grounds, 113 F.2d 103 (9th Cir. 1940); Fox v. Commissioner, 37 B.T.A. 271 (1938). Here what is conspicuously missing is a legal obligation between the employee and the entity that pays the taxes: the White family trust could not make Russell White work for Litho Productions, control his activities, or determine the amount of his compensation. All the trust could do was receive whatever amounts Russell White was paid. See Vnuk v. Commissioner, 621 F.2d 1318, 1320-1321 and n. 5 (8th Cir. 1980) (rejecting leased-employee argument in a similar family trust context); Johnson v. Commissioner, 50 L.W. 2727 (Tax Court, 7 June 1982) (assignment of professional basketball player's salary to Puerto Rican corporation ineffective for income tax purposes where corporation had no ability to force assignor to play basketball).
 
 
 10
 The taxpayers' consolidated brief seems to argue (at least for Russell White)[13] that the conveyance of the "lifetime services" of the grantor to the trust creates the necessary legal obligation (Br. 19-25, 31-34). The short answer to that argument is that the obligation is entirely illusory. The grantor in his capacities as employee and as trustee or trust manager is on both sides of the transaction. There is no one to enforce the ostensible obligation.
 
 C. Invalid grantor trusts
 
 11
 Concededly more was conveyed into both the White and Schulz family trusts than the grantors' earning abilities. A different set of rules applies to gifts (to a trust or otherwise) of income-producing property. Broadly speaking, these rules treat as gifts for income tax purposes gratuitous transfers of all the interest the donor possesses and deny that effect to attempted gifts of carved-out, partial interests.[14] To the extent, however, that the res of these trusts consisted of income-producing property, the trusts are invalid for tax purposes under the grantor trust provisions of the Internal Revenue Code, 26 U.S.C. §§ 671-677. These provisions are the exclusive[15] means of answering the following questions:How far must the grantor go in the direction of a complete surrender of his personal authority over the trust property before trust income will be treated as belonging to the beneficiaries? Put otherwise, what rights may the grantor retain without continuing to be regarded as the substantial owner of the property transferred? M. Chirelstein, op. cit. (note 8 supra ), P 8.04 at 175; cf. P 9.01 at 183.
 
 
 12
 The application of these provisions to a family trust is painstakingly considered in Wesenberg v. Commissioner, 69 T.C. 1005 (1978), and we join the Eighth Circuit in Vnuk, supra, 621 F.2d at 1321, in adopting its analysis for our purposes.
 
 
 13
 The main thrust of the grantor trust provisions is that the trust will be ignored and the grantor treated as the appropriate taxpayer whenever the grantor has substantially unfettered powers of disposition. The hallmark of such discretion is that the grantor can act unilaterally or with the concurrence of someone who is not an "adverse party." "Adverse party" is a term of art, defined in the statute as "any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of a power which he possesses respecting the trust," Section 672(a).
 
 
 14
 The first thing to note is that the beneficiaries, although their interests and the grantor-trustee's may diverge, are not "adverse parties" in the statutory sense because they have no "powers respecting the trust." Thus the statute does not regard the general law of fiduciary duty as an adequate guarantee that grantors will not deal with trust property as if they owned it outright. The taxpayers' contrary arguments (Br. 36-37) must fail. See Wesenberg, supra, 69 T.C. at 1012.
 
 
 15
 The second point is that, despite efforts to skirt the grantor trust provisions by careful draftsmanship, these trusts in substance, if not in form, violate the statute. The drafters (or more accurately the person who designed the kit these taxpayers bought and used) have labeled the husbands as sole grantors and given them little or no beneficial interest in the trust, apparently to avoid threshold problems with equivocal gifts.[16] Then they have given the wives duties as co-trustees and substantial beneficial interests to bring them within the definition of adverse parties. The theory is that these maneuvers will prevent decisions made by husband and wife together[17] from being unconstrained in violation of the statute.[18]
 
 
 16
 In the case of the Schulz family trust, these strategies do not work because most actions require only two of the three trustees to agree, and one of the trustees, the bookkeeper's wife, had no beneficial interest at all in the trust and was therefore not an adverse party.[19] It was possible for any given decision to be made by one of the Schulzes and the bookkeeper trustee.
 
 
 17
 The White family trust also had a supernumerary trustee initially, Mrs. White's brother, but he resigned. For most of the period at issue in these appeals, Mr. and Mrs. White functioned as sole trustees, and Mrs. White was within the definition of adverse party. Nonetheless, the grantor trust provisions were still violated, although in a different fashion. Despite the trust document's recitation that Mr. White was the sole grantor, Mrs. White was also a grantor. Immediately before Mr. White created the trust, and by documents simultaneously executed (Exh. 4), Mrs. White conveyed all her interest in their jointly held property to him. That conveyance can be ignored, either on the familiar tax principle that substance predominates over form,[20] or because the parties themselves treated it as neither a sale nor a gift.[21] Mrs. White also conveyed some property directly to the trust (Exh. 4, p. 3). Thus the statute can be applied with the focus on Mrs. White as grantor. It then becomes clear that she could make unconstrained decisions about trust property and income, because Mr. White, having no beneficial interest in the trust, was not an adverse party.
 
 
 18
 Moreover, this same argument would invalidate for income tax purposes the Schulz family trust, if it had operated without the bookkeeper's wife as spear-carrier. Mr. and Mrs. Schulz, like the Whites, owned their property jointly, and Mrs. Schulz, like Mrs. White, conveyed most of her holdings to her husband. She too conveyed some unspecified property directly to the trust. Disregarding the indirection of the main conveyance, Mrs. Schulz also is a grantor, with effective control over the trust. Her husband's 5% interest is insufficient to make him an adverse party. Consequently, the Commissioner had grounds to assess the amounts in question in the wives' joint returns.
 
 
 19
 The relationships among the parties in these trusts present exactly the sorts of potential problems the grantor trust provisions were designed to meet. Furthermore, nothing in the remaining terms of the trusts imposes any substantive limits whatever on what the trustees may do. In both trusts
 
 
 20
 Trustees' powers shall be construed as general powers of citizens of the United States of America, to do anything any citizen may do in any state or country, subject to the restrictions herein noted. They shall continue in business, conserve the property, commercialize the resources, extend any established line of business in industry or investment, as herein specially noted, at their discretion for the benefit of This Trust, such as, viz: buy, sell or lease land for the surface or mineral rights; buy or sell mortgages, securities, bonds, notes, leases of all kinds, contracts or credits, of any form, patents, trademarks, or copyrights; buy, sell or conduct mail-order business, or branches thereof; operate stores, shops, factories, warehouses or other trading establishments or places of business of any kind; construct, buy, sell, lease or rent suitable buildings or other places of business; advertise different articles or business projects; borrow money for any business project, pledging The Trust property for the payment thereof; hypothecate assets, property, or both, of The Trust in business projects; own stock in, or entire charters of corporations, or other such properties, companies, or associations as they may deem advantageous.
 
 
 21
 A Minute of Resolutions of The Trustees authorizing what it is they determine to do or have done shall be evidence that such an act is within their power.
 
 
 22
 In the unlikely event that these terms are not broad enough:
 
 
 23
 The Trustees shall regard this instrument as their sufficient guide, supplemented from time to time by their resolutions (said resolution to be ratified Always by a Majority of the Trustees then in office and participating in the issuing meeting) covering contingencies as they arise and are recorded in the minutes of their meetings, which are the bylaws, rules and regulations of This Trust.[22]
 
 
 24
 Lacking both procedural and substantive limits, these trusts violate Section 674(a) because there is unconstrained power to dispose of the beneficial enjoyment of trust income or corpus,[23] violate Section 676(a) because there is unconstrained power to revest title to the trust property in the grantor(s),[24] and violate Section 677(a) because there is unconstrained power to distribute trust income (or accumulate it for further distribution) to the grantor or the grantor's spouse.[25] The actual expenditures made document that all powers but the power to revest title to the trust were actually exercised. Since the Schulzes and the Whites retained all the indicia of ownership in the trust property, their joint personal income tax returns for 1972, 1973, and 1974 should have reflected that ownership.
 
 III. Conclusion
 
 25
 Given the deeply rooted instinct not to pay more taxes than the law requires and the endless changes that can be rung in trust draftsmanship, we do not suppose that any single opinion can put a definitive end to devices like the Schulz and White family trusts. Nor do we mean to intimidate taxpayers and their attorneys in their search for the equivalent of the better mousetrap. Nonetheless, it should be clear that certain avenues of tax avoidance are closed. Lucas v. Earl prevents attempts to assign income away from its earner, and the "leased employee" theory is not an easy escape route from the Earl doctrine. And, though the analysis may differ from one case to another, the grantor trust provisions will generally defeat attempts to create trusts of family income-producing property without surrendering any of the family's rights of ownership. If taxpayers persist in ignoring these truisms, we will in the future be sympathetic to the Internal Revenue Service's assessment under 26 U.S.C. § 6653(a) of penalties for underpayment of tax due to negligence or intentional disregard of the rules and regulations of the Internal Revenue Code. Cf. Vnuk, supra, 621 F.2d at 1321.
 
 
 26
 The judgments of the Tax Court are affirmed, with costs to respondent.
 
 
 
 *
 Honorable George N. Leighton, United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 [1]
 As of late March 1982, our docket had seven similar cases set for appeal but stayed pending decision in the instant cases. Horvat v. Commissioner, decided by unpublished order, 582 F.2d 1282 (7th Cir. 1978), certiorari denied, 440 U.S. 959, 99 S.Ct. 1501, 59 L.Ed.2d 772, involved similar issues and has recently been published at the Government's request. See 671 F.2d 990. Although Horvat is precedent for our decision in part, we have analyzed the issues afresh since the parties could not until very recently cite or rely on that case. See Circuit Rule 35
 The Commissioner's brief also lists 32 other cases, most decided by the Tax Court in the last two years, involving the same issues. Govt.Br. 16, n. 6.
 
 
 [2]
 The taxpayers make a host of subsidiary arguments, which are dealt with at n. 10 infra
 
 
 [3]
 41 T.C.M. 599 (1980) (CCH) (both cases)
 
 
 [4]
 Tax Ct.Mem.Dec. P 81,073 (1981) (P-H)
 
 
 [5]
 Actually Mrs. Schulz conveyed most of her interest in the jointly held property and her right to receive a salary to her husband, who in turn conveyed it to the trust. Mrs. White did substantially the same thing. Both women also conveyed some property directly to the trust. For an explanation of why they must be regarded as grantors, see Part II.C infra, especially notes 20-21
 
 
 [6]
 Information digested from the cross-examination of Mr. Schulz before the Tax Court, Tr. 47-66. The testimony does not give exact figures for the various categories of expenditures; where they can be identified they are supplied from the trust's returns
 
 
 [7]
 The figures are taken from the White trust's tax returns; the explanations come from Mr. White's testimony before the Tax Court, Tr. 22-36
 
 
 [8]
 "Personal consumption expenses must obviously be treated as nondeductible on the whole; if they were allowed, the individual tax base could be reduced to zero through expenditures on personal living items and the notion of a tax on economic gain would have to be abandoned." M. Chirelstein, Federal Income Taxation P 7.01 at 140 (2d ed. 1979). Apart from some special provisions, id., not at issue here, deductions must be for ordinary and necessary business expenses (Section 162) and costs associated with investment activities (Section 212)
 
 
 [9]
 Earl involved a lawyer who made a contract with his wife that future income earned by either would belong equally to both. Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81, similarly disregarded for tax purposes an insurance agent's assignment to a family trust of his right to receive renewal commissions on policies sold in earlier years. Together the cases hold that the assignment of compensation due or compensation to be earned is income taxable to the assignor
 
 
 [10]
 As Justice Holmes remarked in Earl, "The validity of the contract is not questioned, and we assume it would be unquestionable under the law of the state of California, in which the parties lived." 281 U.S. at 114, 50 S.Ct. at 241. Thus here the taxpayers' arguments about freedom of contract and about the validity of their arrangements as a matter of Wisconsin law, which comprise large sections of the consolidated briefs, are irrelevant
 
 
 [11]
 We assume that trust administration expenses would be limited to those properly allowable
 
 
 [12]
 This discussion is derived from M. Chirelstein, op. cit. (note 8 supra ), P 9.01 at 182. 26 U.S.C. §§ 666-667 are the statutory provisions involved
 
 
 [13]
 The brief does not differentiate arguments made only on behalf of one taxpayer. The obvious difficulty in Mr. Schulz' case is that he is no one's employee to begin with. Mrs. Schulz' assignment of her salary to the trust would be ineffective for all the reasons the White assignment is
 
 
 [14]
 See, e.g., Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (gift of annual interest coupons to son, while father retained underlying bond, is ineffective to avoid father's income tax); Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055 (assignment of one year's trust income to children ineffective to avoid income tax where assignor kept right to receive income in prior and subsequent years). Contrast Blair v. Commissioner, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465 (gift of part of trust income stream effective to shift incidence of taxes, though balance of income stream retained, where donees' and donor's interests would both last as long as the income stream did)
 
 
 [15]
 Section 671 makes clear that these provisions are meant to supplant judicial rulemaking on the subject of grantor trusts. "This element of exclusivity does not * * * supersede or preempt other standing rules of income-attribution, such as those approved in the Earl and Horst cases. * * * But when the issue is of the Clifford variety (Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788)-i.e., whether the grantor's interest in the trust is so substantial as to be the equivalent of continued ownership-the specific statutory provisions are given exclusive application." M. Chirelstein, op. cit. (note 8 supra ), P 9.01 at 183
 
 
 [16]
 See note 14 supra
 
 
 [17]
 The only decision-makers in the White family trust, and the only active decision-makers in the Schulz family trust
 
 
 [18]
 Sections 674-677 focus on this aspect. Section 673 prohibits trusts that can revert to the grantor within 10 years. The draftsman of these trusts has also skirted Section 673 by making the trust term 25 years. We need not decide whether Section 673 is violated
 
 
 [19]
 The Schulz daughter (who did have a beneficial interest) did not succeed the bookkeeper's wife as the third trustee until 1976, a taxable year not involved in these cases
 Apparently the Schulzes made some effort to amend the trust provisions to provide that all actions had to be approved by all three trustees (unless one trustee was incompetent), but the amendments are undated, handwritten, contradictory, and incomplete. Tr. 47-50. It is certain that only Mr. and Mrs. Schulz were authorized to draw checks on the trust's checking account, or make withdrawals from its savings account. Tr. 54.
 
 
 [20]
 See, e.g., Redding v. Commissioner, 630 F.2d 1169, 1175 (7th Cir. 1980); Falkoff v. Commissioner, 604 F.2d 1045, 1048 n. 2 (7th Cir. 1979)
 
 
 [21]
 The conveyances of both wives recite that they are made for $1.00 in cash and a trust receipt, or for $1.00 and other considerations of value. See White Exh. 4; Schulz Exhs. 17-20. No gift tax returns were filed by either woman, Schulz Tr. 53, White Tr. 30
 
 
 [22]
 Taken from the Declaration of Trust used in both the White and Schulz family trusts
 
 
 [23]
 Wesenberg, supra, 69 T.C. at 1012-1013. Note that the beneficiaries are entitled to receive nothing until the trust terminates, and then only what the trustees have chosen to leave in the trust
 
 
 [24]
 Id. at 1013-1014
 
 
 [25]
 Id. at 1014