UNITED STATES of America, Plaintiff-Appellee,

v.

Gordon S. BUTTORFF, Defendant-Appellant.

No. 83–1368.

United States Court of Appeals, Fifth Circuit.

June 3, 1985.

Rehearing Denied July 10, 1985.

Joe Alfred Izen, Jr., Houston, Tex., for defendant-appellant.

Gordon S. Buttorff, pro se.

James A. Rolfe, USA, Dallas, Tex.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Chief, Jonathan S. Cohen, Robert S. Pomerance, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before RUBIN, POLITZ, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal from a preliminary injunction issued pursuant to section 7408 of the Internal Revenue Code. 26 U.S.C. § 7408. We affirm.

## FACTS AND PROCEEDINGS BELOW

Approximately ten years ago appellant, Gordon S. Buttorff, organized and is now executive director of Constitutional Trust Associates, a group engaged in a commercial tax practice doing business in Dallas, Texas. Since at least 1976, appellant and his associates have promoted, sold, and serviced a trust package,[1] the "Constitutional Pure Equity Trust" (also referred to by the parties as a "Pure Equity" or "Family Trust") which they said would enable its purchasers to avoid probate, significantly reduce income tax liability, and keep financial dealings private. Appellant is neither a lawyer[2] nor an accountant, though he does employ accountants to prepare tax returns.

**A. The Trust.** Appellant advised customers to transfer all their property (including such items as bank accounts, stocks, vehicles, insurance, furniture, jewelry, residences and other real estate) to a trust and then claim the expenses of up-

---

1. Appellant sold a kit of trust forms which included a declaration, introductory materials, and step-by-step instructions for creating and maintaining the trust. Appellant also participated in setting up the trusts and provided for preparation of his customers' income tax returns for the first year after the trust was created. Although the forms were basically the same for all customers, the purchase price of the documents and service varied, based on the value of the assets placed in the trust.

2. The Texas Committee on the Unauthorized Practice of Law filed a complaint against Buttorff and his associates (none of whom is licensed to practice law in Texas) in state court. The parties stipulated, with the court's approval, that the promotion and sale of the Constitutional Pure Equity Trust violated state statutes prohibiting the unauthorized practice of law. On December 16, 1982, that court entered an agreed temporary injunction restraining appellant and his organization from promoting any such trust or device as a method for reducing or eliminating income taxes (except as accountants are permitted to give such advice pursuant to the Internal Revenue Code and regulations), or from preparing any legal documents for any third person. *Committee on the Unauthorized Practice of Law, State of Texas v. Buttorff,* No. 83–1368 (Dist.Ct. of Dallas County, 95th Judicial Dist. of Texas, December 16, 1982).

keep and operation of that property as deductible trust expenditures (including expenses related to home maintenance and repair, utilities, insurance, and automobile upkeep) such that the trust would pay for practically all family ordinary personal living expenses except food. According to trust documents submitted to the court below, generally the wife conveyed her real and personal property to the husband who then conveyed all family property to the trust, along with his income or the right to receive income from his lifetime services, in return for the entire beneficial interest in the trust evidenced by beneficial interest certificates, shares of which were then divided between the husband and wife and/or other family members. Any disbursement of trust income would be made *pro rata* according to the distribution of beneficial interest as evidenced by the certificates, and, if the trust were terminated, the assets were also to be distributed according to the beneficial interest certificates. Appellant and the wife were originally named as trustees; appellant subsequently resigned and the husband was made a trustee. The customers then became sole trustees and beneficiaries (perhaps with other members of the family at the couple's discretion) of the trust. As trustees, the taxpayers still had almost unlimited discretionary powers to deal with the trust assets, distribute income, and terminate the trust.

Such an arrangement was said to yield tax benefits in one of two ways. If no income were conveyed to the trust while a variety of deductions were claimed, a substantial loss would result which was then transferred to the taxpayer's personal tax return as a "distributable net loss" of the trust and used to reduce the personal taxable income to zero or near zero. On the other hand, if the taxpayer conveyed all or most of his income to the trust along with all income producing assets, deductions claimed by the trust could offset income reported by the trust leaving little or no net income to be reported. The taxpayer would then report little or no income on his personal tax return apart from amounts distributed to him by the trust as "consulting fees" (though his actual occupation did not change) or in the form of the trust's distributable net income. Another tax benefit said to follow from use of the trust is income splitting. It was said that when the taxpayer conveyed part of his income to the trust he would put himself in a *lower* tax bracket by lowering the amount reported on the personal return. Income conveyed to the trust was then offset by deductions.

Appellant's clients generally had their tax returns completed by preparers recommended by him. They were also instructed not to seek professional advice from any lawyer or accountant, who were said not to understand such trusts. Appellant also told customers that the trust was unlikely to be examined by the Internal Revenue Service ("IRS"), but, if it were, it would withstand scrutiny.

**B. IRS Treatment of Pure Equity Trusts.** The IRS has consistently refused to recognize such trusts as vehicles for shifting income away from the actual earner or for generating deductions not otherwise available. Thus, when returns of appellant's clients are identified and audited, only deductions which would normally be allowed to an individual, such as home mortgage interest, or to a legitimate business, such as an office in the home used as the exclusive business location, are allowed. Personal expenses are not allowed as deductible merely because property is owned by the trust, and legitimate business expenses are deductible regardless of whether a business is owned by the trust.

The IRS estimated that 464 income tax returns were generated from trusts sold by appellant for the years 1978 to 1981. After properly realigning income and legitimate deductions, the IRS estimates (at an average rate of $6,866 per return) total tax deficiencies of $3.2 million (exclusive of penalties and interest) are attributable to appellant's customers. The wages and overhead for auditing the returns of his customers are estimated to have cost the IRS more than $400,000.

**C. Disposition Below.** The United States instituted this action seeking to enjoin appellant from the promotion and sale of the Constitutional Pure Equity Trust, an allegedly abusive tax shelter within the meaning of sections 6700 and 7408 of the Internal Revenue Code. Some two months later, the district court entered an order denying appellant's motion to dismiss, which rejected his First Amendment defense. Thereafter, following an evidentiary hearing, the court entered an opinion, *United States v. Buttorff,* 563 F.Supp. 450 (N.D.Tex.1983), granting a preliminary injunction to prohibit the promotion, sale, or servicing of the Constitutional Pure Equity Trust or similar schemes or devices by appellant and those acting with him pending final determination of this action. This appeal followed. For the reasons stated below, we affirm.

**DISCUSSION**

This Court has stated: "When an injunction is explicitly authorized by statute, proper discretion usually requires its issuance if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose." *Donovan v. Brown Equipment and Service Tools, Inc.,* 666 F.2d 148, 157 (5th Cir.1982). *See also United States v. Hayes International Corporation,* 415 F.2d 1038, 1045 (5th Cir.1969); *Securities and Exchange Commission v. Management Dynamics, Inc.,* 515 F.2d 801, 806–08 (2d Cir. 1975). The district court found that "each" of the four factors traditionally required before granting preliminary injunctive relief "is specifically satisfied under the facts of this case."[3] The court further pointed out that not only were individual taxpayers who had subscribed to appellant's service faced with actual and anticipated risks and penalties, but there was also a continuing financial drain on the United States Treasury caused by lost revenues and depleted enforcement resources. Obviously, much of this could never be recouped.

**A. Statutory Criteria.**

The district court also found that issuing the injunction would fulfill the legislative purpose by specifically finding that the two requirements imposed by section 7408[4] were met—that appellant's conduct was subject to penalty under section 6700 and that injunctive relief is appropriate in this case to prevent a recurrence of the conduct.

**1. Subject to Penalty.** Section 6700 penalizes any person who makes statements regarding the tax benefits of an arrangement organized or sold by him which he

---

**3.** These factors, which are expressly set out in the district court's opinion, are: (1) A showing of substantial likelihood that the plaintiff will prevail on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the plaintiff outweighs the potential harm from the injunction to the defendant; and (4) the public interest will not be jeopardized by the grant of the injunction. *See, e.g., Canal Authority of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974).

**4.** Section 321(a) of the Tax Equity and Fiscal Responsibility Act of 1983 "TEFRA", Pub.L. No. 97–248, 96 Stat. 324, added section 7408 to the Internal Revenue Code of 1954. Section 7408 provides:

"**§ 7408. Action to enjoin promoters of abusive tax shelters, etc.**

"**(a) Authority to seek injunction.**—A civil action in the name of the United States to enjoin any person from further engaging in conduct subject to penalty under section 6700 (relating to penalty for promoting abusive tax shelters, etc.) may be commenced at the request of the Secretary. Any action under this section shall be brought in the district court of the United States for the district in which such person resides, has his principal place of business, or has engaged in conduct subject to penalty under section 6700. The court may exercise its jurisdiction over such action (as provided in section 7402(a)) separate and apart from any other action brought by the United States against such person.

"**(b) Adjudication and decree.**—In any action under subsection (a), if the court finds—

"(1) that the person has engaged in any conduct subject to penalty under section 6700 (relating to penalty for promoting abusive tax shelters, etc.), and

"(2) that injunctive relief is appropriate to prevent recurrence of such conduct,

"the court may enjoin such person from engaging in such conduct or in any other activity subject to penalty under section 6700."

knows or has reason to know are false or fraudulent as to any material matter.[5]

**(a) Trust invalid.** Several United States Courts of Appeals and the United States Tax Court have consistently invalidated similar trusts for federal income tax purposes on an individual taxpayer basis.[6] We cite only a few of the many cases so holding. *See, e.g., Zmuda v. Commissioner,* 731 F.2d 1417, 1421 (9th Cir.1984) (similar trusts "were shams"); *Holman v. United States,* 728 F.2d 462, 465 (10th Cir.1984) (similar trust "is a mere sham"); *O'Donnell v. Commissioner,* 726 F.2d 679 (11th Cir.1984); *Hanson v. Commissioner,* 696 F.2d 1232 (9th Cir.1983); *Schulz v. Commissioner,* 686 F.2d 490 (7th Cir.1982); *Vnuk v. Commissioner,* 621 F.2d 1318 (8th Cir.1980); *Taylor v. Commissioner,* 49 T.C.M. (P–H) para. 80,552 (1980); *Taylor v. Commissioner,* 52 T.C.M. (P–H) para. 83,-034 (1983) (disallowing claimed loss from constitutional pure equity trust marketed by appellant on the basis of repeated rejection of similar trust arrangements; a copy of this opinion was filed in the proceedings below); *Wesenberg v. Commissioner,* 69 T.C. 1005 (1978). Such trusts have generally been invalidated on four grounds.

**(i) Deduction of personal consumption expenses.** Appellant told clients that once they had conveyed their personal assets, such as cars and residences, to a trust they could deduct personal consumption expenses such as fire insurance, utilities, and repair and maintenance—indeed, almost everything except food consumed at home. However, "[i]t is fundamental to our income tax regime that personal consumption expenditures—food, clothing, travel, education, entertainment—do not generate income tax deductions unless they are somehow inextricably linked to the production of income." *Schulz,* 686 F.2d at 492–93. Thus, the district court correctly found that appellant's representations to the contrary, without explaining the necessity for a business nexus or the fact that if a business nexus existed the trust was unnecessary to qualify for a tax deduction, were fraudulent.

 **(ii) Assignment of income.** Under appellant's trust arrangement, his clients conveyed their prospective future earned income, or "lifetime services" and the right to receive income for performance of those services, to the trust in an effort to avoid personal taxation on that income. However, it is a well established rule that income is taxed to the person who earns it, *Commissioner v. Culbertson,* 337 U.S. 733, 739–40, 69 S.Ct. 1210, 1212–13, 93 L.Ed. 1659 (1949), regardless of any "antici-

---

**5.** Section 6700 provides in pertinent part:

"**§ 6700. Promoting abusive tax shelters, etc.**

"**(a) Imposition of Penalty.**—Any person who—

"(1)(A) organizes (or assists in the organization of)—

"(i) a partnership or other entity,

"(ii) any investment plan or arrangement, or

"(iii) any other plan or arrangement, or

"(B) participates in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

"(2) makes or furnishes (in connection with such organization or sale)—

"(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

"(B) a gross valuation overstatement as to any material matter,

"shall pay a penalty equal to the greater of $1,000 or 10 percent of the gross income derived or to be derived by such person from such activity.

" . . . .

"**(c) Penalty in addition to other penalties.** —The penalty imposed by this section shall be in addition to any other penalty provided by law."

**6.** This fact makes *United States v. Dahlstrom,* 713 F.2d 1423 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984), cited by appellant, clearly distinguishable. In that case, the court refused to uphold a conviction for conspiracy to defraud the United States by promoting a tax shelter because it was "convinced that the legality of the tax shelter program advocated by the appellants in this case was completely unsettled by any clearly relevant precedent on the dates alleged in the indictment." *Id.* at 1428.

patory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it." *Lucas v. Earl,* 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731 (1930). Determination of the proper taxpayer depends upon which person or entity controls the earning of the income rather than who receives the income. *Vnuk,* 621 F.2d at 1320 (citing *Vercio v. Hailey,* 73 T.C. 1246 (1980)). Thus, in invalidating similar trusts for tax purposes, the Eighth Circuit stated that:

> "Where the taxpayer simply assigns his lifetime services and income earned from the performance of those services, and the taxpayer rather than the trust has 'ultimate direction and control' over the earning of the compensation,' the conveyance is ineffective to shift the tax burden from the taxpayer to the trust." *Vnuk,* 621 F.2d at 1320 (citing *Wesenberg v. Commissioner,* 69 T.C. 1005, 1010–11 (1978)).

To the same effect are *Hanson,* 696 F.2d at 1234; *Holman,* 728 F.2d at 464; *O'Donnell,* 726 F.2d at 681.

As in those cases, appellant's clients were not bona fide servants of the trust because the trust had no right to supervise the taxpayer's employment or determine the resulting income or benefit, and the taxpayer had no legal duty to earn money or perform services for the trust.[7] The grantor's purported conveyance of lifetime services to the trust does not create such a legal obligation because the grantor is on both sides of the transaction, as employee and as trustee, leaving no one to enforce the obligation. *Schulz,* 686 F.2d at 494. Moreover, it seems plain that in at least the vast majority of instances such a purported conveyance of lifetime services would be unenforceable and essentially nugatory under applicable state law.

**(iii) Grantor trust.** Similar trusts have also been invalidated for federal income tax purposes under the "grantor trust" provisions. 26 U.S.C. §§ 671–77. *E.g., Vnuk,* 621 F.2d at 1321; *Hanson,* 696 F.2d at 1234; *Holman,* 728 F.2d at 464–65; *Zmuda,* 731 F.2d at 1421. Basically, these sections provide that a trust will be ignored for tax purposes and the grantor will be treated as the appropriate taxpayer when he retains beneficial enjoyment of the corpus and income of the trust and the power to control and liquidate the trust either unilaterally or with the concurrence of someone who is not an "adverse party." (Adverse party is defined as "any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust." 26 U.S.C. § 672(a).)

Appellant attempts to distinguish his trust from those consistently invalidated for tax purposes by the courts as grantor trusts. In the trust arrangements examined in the court below, the wife generally conveyed all her interest in their joint property to the husband who then conveyed all their property to the trust, and both husband and wife became trustees and beneficiaries. Thus, technically, the wife is not a grantor. The district court refused to accept this distinction, stating that "[a] a trust is not sheltered from the operation of the grantor trust provisions by an artificial construction of adversity between parties." *United States v. Buttorff,* 563 F.Supp. 450, 454 (N.D.Tex.1983). This view was adopted by the Seventh Circuit in *Schulz.* That court suggested that the wife's "conveyance can be ignored, either on the familiar tax principle that substance predominates over form, or because the parties themselves treated it as neither a sale nor a gift." *Schulz,* 686 F.2d at 496 (footnote omitted). *Schulz* therefore found that the trust in question violated the grantor trust statutes in substance, if not in form. *Id.* at

---

7. These factors also distinguish this sort of trust arrangement from the "leased employee cases." *Vnuk,* 621 F.2d at 1321 n. 5. In those cases, an employee is legally obligated to provide services to a corporation which then contracts to provide his services to a third party at a particular salary to be paid to the corporation. The corporation is then taxed on that salary. *See, e.g., Rubin v. Commissioner,* 429 F.2d 650 (2d Cir. 1970).

495. To the same effect are *Holman,* 728 F.2d at 464–65, and *Zmuda,* 731 F.2d at 1421.

**(iv) Sham.** Finally, it has frequently been recognized that trusts of this sort are mere shams, wholly lacking in any real substance and thus without any effect whatever for federal tax purposes. *See Zmuda,* 731 F.2d at 1421; *Holman,* 728 F.2d at 465.

**(b) Knowledge and materiality.** Therefore, the fact that appellant assured customers that the purported tax benefits of the trust could lawfully be availed of, despite consistent rejection of similar schemes by the courts for the above reasons, and the fact that appellant counseled his clients not to seek separate opinions from lawyers or accountants, demonstrate that the district court was correct in finding that appellant knew or had reason to know that his representations to his customers regarding the tax benefits of his trust package were false and misleading. Furthermore, appellant's customers whose IRS audits have resulted in disallowance of many of the claimed trust deductions testified that, had they known of the IRS treatment of these trusts, they probably would not have bought appellant's package. Thus, appellant's false statements regarding tax benefits should be considered material within the meaning of section 6700. According to the legislative history, a matter is considered material to the arrangement "if it would have a substantial impact on the decision making process of a reasonably prudent investor." S.Rep. No. 97–494, 97th Cong.2d Sess. 267 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 781, 1015. This test was amply met here.

**2. Prevention of Recurrence.** Section 7408 further requires the district court to consider the appropriateness of an injunction in light of the need to prevent a recur-

rence of the violation. The district court specifically found that an injunction was "necessary" for this purpose. The court cited appellant's previous conviction for aiding and abetting taxpayers in filing fraudulent tax forms, *United States v. Buttorff,* 572 F.2d 619 (8th Cir.) (affirming conviction on nine counts of aiding and abetting the filing of false withholding certificates), *cert. denied,* 437 U.S. 906, 98 S.Ct. 3095, 57 L.Ed.2d 1136 (1978), and the fact that there was no indication that appellant would tailor his presentation to stay within the law,[8] given his continued insistence that his trust arrangement offered legitimate tax benefits, as evidence of the necessity for the injunction to prevent recurrence of the violations of section 6700.[9]

In making this determination, the United States suggests an analogy to the injunctions issued to enforce securities laws in which courts have considered such factors as the defendant's having previously been found liable for illegal conduct, the degree of scienter, whether the infraction is an isolated occurrence, whether the defendant maintains that his past conduct was blameless, and whether his occupation would place him in a position where future violations could be anticipated. *E.g., Securities and Exchange Commission v. Commonwealth Chemical Security, Inc.,* 574 F.2d 90, 100 (2d Cir.1978). Examination of these factors in this case reflects that the injunction is appropriate. Appellant has been found liable for illegal conduct. Though not exactly the same conduct, it was conduct which promoted and aided others in a tax-related fraud on the government which showed a disdain for the income tax laws. Appellant did know or have reason to know of the ineffectiveness of his trust package for the purpose of according the tax benefits for which it was sold. He sold hun-

---

**8.** For example, although appellant admits that he became aware of the prohibition against the assignment of income in 1977, a taped promotional speech, which includes references to the purported benefits of income assignment, was being made available to prospective customers as late as the month this suit was filed.

**9.** In fact, appellant was convicted on five counts of knowingly and willfully violating the preliminary injunctive order entered below in October 1984 in the United States District Court for the Northern District of Texas. *United States v. Buttorff,* No. CR3–84–129–G (N.D.Tex.1984).

dreds of such trust packages and continues to assert that the trust as set up does have tax advantages despite the many cases holding similar trusts to be invalid for such tax purposes. If not enjoined from using his trust, appellant's occupation puts him in a position to continue to promote such a trust. The district court's finding that the injunction is necessary to prevent recurrence of the prohibited conduct is amply supported and not clearly erroneous or an abuse of discretion.

## B. Adequate Remedy at Law.

Appellant contends that the injunction is improper because the government has an adequate remedy at law by prosecution under the criminal sections of the Internal Revenue Code and Title 18. We recognize that "[a]s a general rule, courts are reluctant to issue injunctions against the commission of a crime," although "if the court finds that the prosecution of the criminal charge is not an adequate remedy, as when the conduct is creating a widespread public nuisance ... the fact that a crime is involved should not prevent the court from entering an injunction." 11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2942 at 386–87.

Here, however, we deal with a statute expressly authorizing injunctive relief at the request of the Secretary of the Treasury, on the finding by the court of stated preconditions, against actions denounced as wrongful by positive, public law. In such an instance, the traditional equity guidelines for injunctive relief, both preliminary and permanent, may be somewhat modified. *See, e.g., Donovan v. Brown Equipment Dynamics, Inc.,* 666 F.2d at 157;

*United States v. Hayes International Corporation,* 415 F.2d at 1045 ("irreparable injury should be presumed from the very fact that the statute has been violated"); *Culpepper v. Reynolds Metal Co.,* 421 F.2d 888, 894–95 (5th Cir.1970) (same); *Securities and Exchange Commission v. Management Dynamics, Inc.,* 515 F.2d at 806–08.

As we have observed, section 7408 authorizes an injunction at the request of the Secretary where the court finds that the person enjoined has engaged in conduct subject to penalty under section 6700 and "injunctive relief is appropriate to prevent recurrence of such conduct." No other requirements are stated. The district court found that the injunction was "necessary" to prevent recurrence of the prohibited conduct. This is tantamount to a finding that criminal and other legal sanctions would not suffice to prevent such recurrence.

Prior to the enactment of section 6700, the Internal Revenue Code contained no penalty provisions specifically directed toward promoters of abusive tax shelters and other abusive tax avoidance schemes. In appropriate cases, the promoter might be subject to civil or criminal penalties for false or fraudulent return preparation or willful attempts to evade tax. S.Rep. No. 97–494, 97th Cong.2d Sess. 266 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad. News 781, 1014. The legislative history of sections 6700 and 7408 indicates a congressional finding that these and other existing legal remedies for halting abusive tax shelters were not adequate.[10] Indeed, the legislative purpose in enacting these statutes was to allow the IRS to attack the growing

---

**10.** Thus, *United States v. Petersen,* 91 F.Supp. 209 (S.D.Cal.1950), *aff'd,* 191 F.2d 154 (9th Cir.), *cert. denied sub nom. California v. United States,* 342 U.S. 885, 72 S.Ct. 174, 96 L.Ed. 664 (1951), which appellant cites, is properly distinguished. In that case, the government sought an injunction to restrain the defendants from selling liquor at an establishment located on private land within a national park without a federal permit. The court stated that the United States would be entitled to the injunction sought if such remedy were necessary to prevent irreparable injury to federal property rights, to protect the general welfare, or to abate a public nuisance. *Id.* at 213. However, because the defendant's acts constituted nothing more than a violation of existing regulations, the criminal remedy at law was considered adequate. We have no quarrel with such reasoning. That case involved no statute expressly providing for injunctive relief. In this case, Congress specifically found that there was no adequate remedy at law which could reach abusive tax shelter organizers and therefore created a statute authorizing courts to enjoin such activity.

phenomenon of abusive tax shelters at their source—the organizer and sales-man—in the "most effective way"—by injunction. As the Senate Report states:

"The committee believes that the penalty provisions of present law are ineffective to deal with the growing phenomenon of abusive tax shelters. Abusive tax shelters must be attacked at their source: the organizer and salesman.... [T]he Internal Revenue Service can be expected to approach the problem with vigor since prevention of abusive shelter promotions will require less manpower than enforcement actions against numerous investor-taxpayers....

" . . . .

"The bill provides for a penalty on promoters of investments with abusive positions (see sec. 331 of the bill [section 6700] described, above). The committee believes that the most effective way in which this new penalty can be enforced is through injunctions against violators to prevent recurrence of the offense. The ability to seek injunctive relief will insure that the Internal Revenue Service can attack tax shelter schemes years before such challenges would prove possible if the Internal Revenue Service were required to await the filing and examinations of tax returns by investors. Thus, injunctive relief will better enable the Internal Revenue Service to protect the integrity of the tax laws and to protect potentially innocent investors against widespread marketing of such tax schemes." S.Rep. No. 97–494, 97th Cong., 2d Sess. 266, 268 (1982) *reprinted in* 1982 U.S.Code Cong. & Ad.News 781, 1014, 1016.

This method avoids the drain on the resources of the IRS required by auditing individual accounts, a multiplicity of suits on the same issue against individual tax-payers, and piecemeal litigation, all of which would only encourage violations in the doubtless accurate belief that the IRS would be unable to detect and pursue every taxpayer in violation.

Moreover, section 7408 specifically provides that "[t]he court may exercise its jurisdiction over such action ... separate and apart from any other action brought by the United States against such person." 26 U.S.C. § 7408(a). And, the legislative history clearly indicates that section 7408 was intended to provide an additional remedy against promoters of abusive tax shelters, but "not in any way [to] restrict the right of the United States to commence or carry on any other action against the organizer or seller." S.Rep. No. 97–494, 97th Cong., 2d Sess. 269 (1982), *reprinted in* U.S.Code Cong. & Ad.News 781, 1017.

Accordingly, given the district court's adequately supported findings and the provisions and legislative history of section 7408, we hold that the existence of criminal or other legal sanctions did not require that the district court deny the requested injunctive relief.

**C. Unclean Hands.**

Appellant contends that the government may not invoke the court's equity jurisdiction to seek an injunction because it did not come to equity with "clean hands." *See* 11 Wright & Miller *supra,* § 2946 at 411–17. Appellant claims that a special agent of the IRS, in the course of a criminal investigation, obtained a list of the names and addresses of his customers from an "informant" who had burglarized his office, that this list was used by the special agent in a criminal investigation, and that customers on the list were later audited resulting in information regarding the returns of some of these clients which was used as evidence in this case. However, "[t]he alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct." *Mitchell Brothers Film Group v. Cinema Adult Theatre,* 604 F.2d 852, 863 (5th Cir.1979), *cert. denied sub nom. Bora v. Mitchell Brothers Film Group,* 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980). *See also* 11 Wright & Miller, *supra,* at 414. In this case, appellant has not proved that the plaintiff came

before the court with unclean hands as no sufficient connection between the alleged theft of his files and the government's present cause of action was adequately shown. The IRS examining agent and tax expert testified that he did not receive a list of names from the IRS criminal investigator and also testified to methods used by the IRS to identify "family trusts" such as those used by appellant's customers. Moreover, "[t]he unclean hands defense is not an automatic or absolute bar to relief." 11 Wright & Miller, *supra*, at 415.

### D. Limits of Injunction.

Appellant argues that the injunction[11] is so broad that it would prevent him from pursuing his occupation of tax planning and counseling. However, it is clear from the order issued by the district court, that appellant is enjoined only from promoting, selling, or servicing the Constitutional Pure Equity Trust or a similar type of trust whose like purported tax benefits have been discredited in previous cases against individual taxpayers.[12] Appellant promot-

ed and sold a packaged kit of forms and documents purportedly offering a variety of advantages including tax benefits. No evidence was offered to show that any of appellant's customers would have purchased the packaged trust for nonfederal tax reasons or that any of his customers failed to take advantage of the purported federal tax benefits. The whole key to the marketing and sale of the trusts was obviously the falsely represented purported tax advantages.

■ We narrowly construe the injunctive order to enjoin appellant from promoting, selling, or servicing the Constitutional Pure Equity Trust and similar schemes only if the trust or similar scheme is sold, promoted, or serviced in a context which is to some extent commercial, and only if the trust or similar scheme is sold, promoted, or serviced to any extent expressly or impliedly on any basis, representation, or prediction of any purported federal tax benefits from such trust or scheme, or with any intent to afford a user thereof any such

---

11. That order provides in pertinent part:

"IT IS ORDERED that defendant Buttorff and all those in active concert or participation with him, including Constitutional Trust Associates and all those acting by, for, or through it, are hereby enjoined and restrained as follows:

"1. Defendant and others described above are prohibited, pending the final hearing and determination of this action, from selling and promoting either directly or indirectly the 'Constitutional Pure Equity Trust,' or any similar scheme or device.

"2. Defendant and others described above are prohibited, pending final determination, from representing that such a trust, scheme, or device eliminates or reduces the federal tax liability of a participant, and are prohibited from furnishing or distributing materials, including tape recordings and written information, which so indicate.

"3. Defendant and others described above are prohibited, pending final determination, from performing services for others such as counseling, tax return preparation, or preparation of deeds, resolutions, minutes, or other legal documents in connection with such trust, scheme or device, including those trusts sold or formed prior to the entry of this Order."

12. Similar orders enjoining the organization, promotion, sale, or servicing of a named trust

plan have been issued by other courts, both to prevent conduct subject to penalty under section 6700 and under other Internal Revenue Code sections. *E.g., United States v. Hutchinson*, 83–1 U.S.T.C. Para. 9322 (S.D.Cal. April 6, 1983) (permanently enjoining the organization, promotion, sale, or servicing of named trust or similar trusts which conduct was found to violate section 6700 and was also subject to injunctive relief under section 7407, which authorizes injunctions against tax preparers engaging in fraudulent or deceptive conduct which substantially interferes with the proper administration of internal revenue laws); *United States v. Landsberger*, 534 F.Supp. 142 (D.Minn.1981) (permanently enjoining the promotion, sale, or servicing of named trust or similar device which "differs little from the 'family trust' plan which has been held illegal by numerous courts" under section 7402(a) which authorizes injunctions necessary or appropriate to enforce internal revenue laws and section 7407 which authorizes injunctions against tax return preparers engaging in fraudulent and deceptive conduct which substantially interferes with the proper administration of tax laws), *aff'd in part, vacated and remanded in part*, 692 F.2d 501 (8th Cir.1982) (injunction order affirmed); *United States v. White*, 583 F.Supp. 1118 (Minn.1984), *appeal pending* (8th Cir., No. 84–5132).

purported tax benefits, or by attempting to influence a user to believe that any such benefits may be available or advantageously claimed. We hold that, given the nature of the Constitutional Pure Equity Trust, it is for federal tax purposes essentially a sham and affords no tax benefits, and its commercial marketing on the basis that it does afford such benefits tends both to mislead and to result in violations of law.

### E. First Amendment.

■ Finally, we turn to appellant's principal contention, that the First Amendment prohibits the district court's injunction as a prior restraint on his right to disseminate information regarding estate and income tax planning. We affirm the district court's rejection of this argument on the basis that the First Amendment does not protect commercial speech which is inherently misleading or has proven subject to abuse, nor does it protect commercial speech which promotes an illegal activity or transaction. *Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 563–64, 100 S.Ct. 2343, 2349–50, 65 L.Ed.2d 341 (1980).

■ As appellant concedes, he is engaged in commercial speech for profit. The statements he has made concerning the purported tax benefits of the Constitutional Pure Equity Trust were made in an effort to promote and sell the packaged trust forms and his personal services in connection therewith, all for profit. The United States Supreme Court has summarized the commercial speech doctrine in the context of advertising for professional services: "Truthful advertising related to lawful activities is entitled to the protections of the First Amendment. But when the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions. Misleading advertising may be prohibited entirely." *In re R.M.J.,* 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982). *See also Friedman v. Rogers,* 440 U.S. 1,

15–16, 99 S.Ct. 887, 896–897, 59 L.Ed.2d 100 (1979). Appellant's representations regarding the tax advantages of his trust were misleading.

The United States Supreme Court also continues to refuse to shield commercial speech which promotes an illegal activity or transaction. *Pittsburgh Press Co. v. The Pittsburgh Commission on Human Relations,* 413 U.S. 376, 389–90, 93 S.Ct. 2553, 2560–61, 37 L.Ed.2d 669 (1973) (upholding ordinance forbidding newspaper to run help wanted ads in sex-designated columns); *Village of Hoffman Estates v. Flip Side, Hoffman Estates, Inc.,* 455 U.S. 489, 496, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982) (upholding ordinance regulating the sale of items designed or marketed for use with illegal drugs). Appellant's promotion of his trust does advocate the attempt to take tax benefits repeatedly declared invalid by the courts.

Furthermore, in enjoining appellant's misleading commercial speech, the district court was relying upon the legislative determination that an injunction was an appropriate form of restriction. Section 7408 specifically provides for an injunction when the organizer or salesman of a plan makes false or fraudulent statements of a material nature regarding tax benefits of participating in the plan—conduct which is subject to penalty under section 6700—and where an injunction is appropriate to prevent recurrence. We do not today decide that section 7408 is constitutional in all its possible applications. However, in this case, where it has been determined that appellant's statements regarding the tax benefits of his trust, which constitute commercial speech, are misleading in the context contemplated by Congress in enacting the statute, and the injunction prohibiting such statements is adequately tailored and construed to enjoin only such commercial speech which has been shown to be both misleading and likely to promote illegal activity, such representations are not protected by the First Amendment against restraint authorized by section 7408 and properly found necessary in the particular

case to prevent recurrence of the denounced conduct.

Appellant argues that the injunction does more than protect against misleading information but prohibits him from disseminating any information regarding tax planning or trusts. It is true that the Supreme Court has also stated, "[a]lthough the potential for deception and confusion is particularly strong in the context of advertising professional services, restrictions upon such advertising may be no broader than reasonably necessary to prevent the deception." *In re R.M.J.*, 455 U.S. at 203, 102 S.Ct. at 937. However, the district court's order is not a total ban on appellant's commercial speech, as he urges, but is a ban on the promotion of the Constitutional Pure Equity Trust or similar trusts because his representations regarding the tax benefits of such trusts have proven to be misleading. Appellant may continue to disseminate information regarding tax planning, or even regarding trusts, as long as it does not involve this type of trust which has been discredited for the purpose of affording any federal tax benefits. *See Friedman v. Rogers, supra.*

We recognize that an arguably related issue is presently pending before the United States Supreme Court by virtue of its grant of certiorari in *Securities and Exchange Commission v. Lowe*, 725 F.2d 892 (2d Cir.), *cert. granted sub nom. Lowe v. Securities and Exchange Commission*, —— U.S. ——, 105 S.Ct. 81, 83 L.Ed.2d 29 (1984). In *Lowe*, a divided Second Circuit panel held that the district court had erred in refusing, on First-Amendment-related grounds, an SEC-requested injunction to prohibit Lowe from publishing and distributing, for profit, an investment advisory service. Due to several violations of the Investment Advisers Act of 1940 and other frauds, the SEC had revoked Lowe's regis-

tration as an investment adviser. Lowe never sought judicial review of this order. However, Lowe subsequently published and distributed two investment advisory services, and the SEC then sought an injunction, under sections 203 and 209 of the Investment Advisers Act, 15 U.S.C. §§ 80b–3, 80b–9, to prohibit this activity and to enforce its previous order.

Our appellant Buttorff seeks to distinguish the Second Circuit's decision in *Lowe* on the basis that it is essentially a licensing case—Lowe was merely prohibited from engaging in a business for which he was not licensed as required by federal law. Here no federal law requires that Buttorff be licensed in order to engage in the business of giving tax advice. Consequently, appellant urges that this is a substantially weaker case for injunctive relief than *Lowe*. We are not persuaded. While its licensing aspects may prove to be determinative, other aspects of *Lowe* reflect that in many respects it presents a substantially less compelling case for First Amendment exception than the case now before us.

As the district court pointed out in *Lowe:*

"Investment advisory material disseminated to the public is not commercial advertising of a product or service. Such publications are not the words of a seller peddling *his own wares or services*, but those of an apparently detached *observer commenting on the value of choses offered or held by others.* To be sure, the investment publisher has a financial motivation to disseminate his analyses and recommendations, but so may the literary publisher or political pamphleteer. Their motivations differ in kind from the monetary incentives characteristic of the advertiser of a particular product." *Securities and Exchange Commission v. Lowe*, 556 F.Supp. 1359, 1366 (E.D.N.Y.1983) (emphasis added).[13]

---

**13.** Nevertheless, the district court did rule that the SEC could prevent Lowe from providing his subscribers "current information by telephone" as this "creates the danger of personal advice." 556 F.Supp. at 1371. While the district court in *Lowe* thus avoided one extreme, the Second Circuit majority avoided the other, noting that it

was not passing on whether it would be appropriate to bar "a publication dealing only with market indicators generally or making recommendations only as to groups of securities (e.g. air transport, beverage-brewers, mobile homes) ...." 725 F.2d at 902 n. 7.

Here, by contrast, the Constitutional Pure Equity Trust and the related services which appellant promotes are products and services of his, or in which he is financially interested. Moreover, as the Second Circuit acknowledged in *Lowe*, "[n]o contention is made that any of the information published in the advisory services has been false or materially misleading" or "that Lowe himself ... has profited through personal or corporate investments from the investment advice rendered." 725 F.2d at 895. Here, however, the false and misleading nature of the promotion of the Constitutional Pure Equity Trust, and the inherently deceptive character of the trust itself, with its implicit promise of tax benefits which are wholly illusory, is clearly established. Further, unlike the publication in *Lowe*, the promotion of the Constitutional Pure Equity Trust invites its purchasers to break the law for their own financial gain. Finally, appellant here, unlike Lowe, does personally profit from the actions of his customers in acquiring the goods being touted by his promotions—namely, the trust kits and the services sold by appellant. In short, Lowe was enjoined from publishing impersonal, accurate advice about how others might legally invest in the goods and products of third parties in which he was not interested; appellant is enjoined from attempting to sell his own misleadingly promoted and inherently deceptive product and services which, in effect, encourage violations of law by his customers.

We mention *Lowe* not to intimate any view on the merits of the decision there, but rather because it points up how the present case falls so clearly within the First Amendment exception for pure commercial speech which is both misleading and tends to promote illegal conduct.

We conclude that the district court's injunction, expressly authorized by section 7408, does not violate appellant's rights under the First Amendment.

For the foregoing reasons, the decision of the district court is affirmed.

AFFIRMED.