ROBERT M. PATTERSON AND PATRICIA PATTERSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Patterson v. Commissioner
Docket No. 7367-81.
United States Tax Court
T.C. Memo 1984-339; 1984 Tax Ct. Memo LEXIS 334; 48 T.C.M. (CCH) 418; T.C.M. (RIA) 840339; July 3, 1984. Gary James Joslin, for the petitioners. Dennis Brager and Charles Williams, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Addition to Tax
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
1977
$8,318
$416
1978
25,760
1,288
*336 The following issues are presented for decision: 1. Whether petitioners are taxable in 1977 and 1978 on income reported in the name of the Petterson Trust; 2. Whether petitioners are entitled to deduct the cost of materials purchased for use in creating the Patterson Trust; and 3. Whether any part of petitioners' underpayment of tax for 1977 and 1978 was due to negligence or intentional disregard of the regulations within the meaning of section 6653(a). [1]
FINDINGS OF FACT At the time the petition was filed, petitioners Robert M. and Patricia Patterson, husband and wife, were legal residents of Harbor City, California. They filed joint Federal income tax returns for 1977 and 1978. In the last quarter of 1977, petitioner Robert M. Patterson (hereinafter Dr. Patterson), who was engaged in the practice of medicine, purchased from the Institute of Individual Religious Studies (IOIRS) a trust package consisting in part of a declaration of trust and preprinted minutes with blanks to be completed. On November 1, 1977, Dr. Patterson, as trustor-creator, executed *337 the Declaration of Trust purportedly creating the Patterson Trust and designating Mrs. Patterson and their daughter, Pamela, as trustees. The Declaration of Trust contained, among others, the following provisions: Trustees may do anything any individual may legally do in any state or county, subject to the restrictions herein noted. They shall continue in business, conserve the property, commercialize the resources, extend any established line of business in industry or investment, as herein specially noted, at their discretion for the benefit of THIS TRUST * * *. A Minute of Resolutions of The Board of Trustees authorizing what it is they determine to do or have done shall be evidence that such an act is within their power. All funds paid into the treasury are and become a part of the CORPUS of THIS TRUST. Contemporaneously with the execution of the Declaration of Trust, Mrs. Patterson transferred to Dr. Patterson by quitclaim deed, her interest in their real estate, including the family residence (listed on Schedule C, referred to below), and Dr. Patterson then conveyed the real estate by quitclaim deed to the trust. Also, at the same time, items of personal property (listed *338 on Schedule A, referred to below) numbering in the hundreds, consisting mainly of personal items and household furnishings, ranging from toothbrushes to oak chests, and the furniture and equipment of his medical office, were purportedly transferred to the trust. Dr. Patterson estimated the value of the transferred property at over $1 million. Minutes of the first and second meetings of the trustees were dated, respectively, November 1 and 2, 1977. Forms for these minutes were part of the IOIRS kit, and the blanks were appropriately completed. With reference to the property referred to in the immediately preceding paragraph, the minutes of the first meeting recite: 5. That, on this date, THE TRUSTEES of THIS TRUST received R. M. Patterson M.D.'s offer of certain of his real and personal properties listed below in accordance with applicable law and the Declaration of TRUST, for and in exchange for One Hundred (100) Units of Beneficial Interest being ALL of the Beneficial Interest of THIS TRUST; (1) The lifetime services of Patricia A. Patterson and all of the currently earned remuneration accruing therefrom. (2) The real property conveyed, ref. attached Schedule "B". *339 (3) A copy of "Schedule A" a complete listing of the personal property to be conveyed. The minutes recite that, in consideration of the foregoing provisions, 100 shares of Beneficial Interests in the trust will be issued to Dr. Patterson. The certificates of beneficial interest stated on their face: This Certificate conveys no interest of any kind in The Trust assets, management or control thereof. Benefits hereby conveyed consist solely of the emoluments as distributed by the action of The Trustees and nothing more. * * * The minutes of the second meeting, dated November 2, 1977, recite that Dr. Patterson had surrendered his 100 units of Beneficial Interest in the trust and requested that 50 units be reissued to him and 50 units to Mrs. Patterson. Dr. Patterson and Mrs. Patterson were also designated as Executive Manager and Executive Trustee, respectively; they were employed in this capacity "from THIS DATE and for life By THIS TRUST," subject to annual review by the trustees; they were to be remunerated for their services in amounts agreed upon by the trustees. The minutes further stated: The Executive Manager and the Executive Trustee shall manage the day *340 to day business affairs of THIS TRUST. This contract requires that the Managers shall reside in THIS TRUST'S HEADQUARTERS in order to best maintain and conserve The Trust assets. If the Managers do not agree to live in the Trust headquarters they will be required to retain full time security, gardening, maintenance and janitorial personnel for the Trust headquarters. The responsibilities of the trust were described as follows: ARTICLE II RESPONSIBILITIES OF THE TRUST. A. TRANSPORTATION: The Trust shall furnish transportation by any means necessary to carry out the duties of the Executive Trustees. B. HEALTH CARE: THIS TRUST shall furnish to the Executive Trustees at the expense of The Trust, full Health Care including Medical Doctor, Dental and Chiropractic and all other health care services; Nursing home, Hospital care and prescription drugs, nonprescription drugs and health care products as needed. C. MISCELLANEOUS EXPENSES: Trustees may pay such incidental expenses in the furtherance of Trust business to the Trustee or other persons incurring such expense. Such incidental expenses may be in the form of receipts substantiating money spent, checks written *341 in advance of the expenditure, or payment of items charged on credit cards or open accounts. The minutes of the third meeting of the trustees, dated November 3, 1977, stated among other things, that Dr. Patterson requested the Board of Trustees to cancel his 50 units of Beneficial Interest in the trust and to issue them to Mrs. Patterson, their children, and himself as follows: 10 Units to Sherry Patterson 10 Units to Pamela Patterson 10 Units to Robert Michael Patterson 15 Units to Mrs. Patterson 15 Units to Dr. Patterson Sherry, Pamela, and Robert Michael Patterson are petitioners' children. Under date of November 2, 1977, Dr. Patterson and the trust signed a purported agreement in pertinent part as follows: In consideration of the terms and the mutual promises and covenants contained herein, and the other valuable consideration, the receipt of which is hereby acknowledged, it is agreed: 1. The Trust hereby agrees to lease to the Doctor, and the Doctor hereby accepts, the office space and/or buildings, grounds, furnishings, equipment and instruments described in the schedule attached hereto and labelled Exhibit "A". 2. The Trust shall supply to the Doctor *342 all office supplies and materials reasonably required by the Doctor for the operation of his business. 3. The Trust shall provide to the Doctor the following personnel for assistance in the Doctor's operation of his business: Secretary-Receiptionist Nurse - At Least of L.V.N. qualifications Insurance Billing Clerk, (Medical Claims) C.P.A. auditing. 4. The Trust shall perform all accounting and supervise all billings on behalf of the Doctor. 5. The Doctor, in consideration of the services performed by the Trust, shall pay to the Trust an amount equal to 20 per centum of the gross income of the Doctor's, derived from the operation of his business, said amounts to be computed and paid on a Semi Monthly basis. On January 5 or 6, 1978, Dr. Patterson resigned as trustee. The minutes of the meeting of the trustees, dated January 6, 1978, recite that Donald Middleton, petitioners' income tax return preparer, was elected as a trustee. For 1977, a fiduciary income tax return was filed for the Patterson Trust showing income of $11,849, including dividend, interest, and "contract nominee trustee" income of $10,500. Among the deductions claimed were depreciation on the "Trust *343 Hdq. Bldg.," i.e., the family residence, and the cost of residential utilities, telephone, and insurance. On Schedule C of their joint return for 1977, petitioners reported total income of $110,591 from the medical practice, and deducted among other items, $10,500 as "contract nominee fees." On Schedule A, petitioners deducted $10,000 as "Cost to maintain and conserve assets and/or minimize taxes," i.e., the cost of the IOIRS trust package. For 1978, a U.S. Fiduciary Income Tax Return was filed showing the receipt of dividends, interest, and, among other items, $80,500 as "contract income," $914 as an IOIRS finders fee for the Bridston Trust, and $758 for the Crown-Boston-Ziegler Trust. Deductions were claimed for most of the expenses incurred in running Dr. Patterson's medical office, depreciation of the "Trust Hdq's. Bldg.," and distributions of $15,000 by the trust. The fiduciary return shows taxable income of $26,334.On Schedule C of their 1978 joint income tax return, petitioners reported total income of $121,165 from the medical practice and deducted, among other items, "Contract nominee fees" of $84,100, for a net profit from the medical practice of $24,956. In November *344 1977, a bank account was opened in the name of the trust at the Crocker National Bank. Dr. and Mrs. Patterson were the only authorized signatories on the account. After the trust was formed, funds from its bank account were used to pay, among other things, real estate taxes, utility bills, and home owners insurance on the family residence which was designated as trust headquarters. Similarly, trust funds were used to make church contributions which were formerly made by petitioners individually. During 1978, trust funds were also used to pay medical expenses of Mrs. Patterson. Dr. Patterson continued to write checks on the trust account after he resigned as trustee. Neither Donald Middleton nor Pamela Patterson signed checks on the account. Checks related to Dr. Patterson's medical practice were prepared by an employee in the office, and most of them were signed by Mrs. Patterson. Donald Middleton, who became a trustee in January 1978, prepared petitioners' joint income tax returns for 1977 and 1978. He is not a certified public accountant or public accountant but is an Internal Revenue Service enrolled agent. He never made any independent determination as to validity of *345 the trust but relied completely upon the statements of the persons from whom the family trust package was purchased. Middleton received no fee for his service as trustee and, except for attendance at the annual meeting, never met with the other trustees or discussed with them any business of the trust. The trust did not pay any of his medical or other personal expenses. OPINION 1. Taxation of the Trust Income
This is another case in which a purported family trust has been created with papers sold by the Institute of Individual Religious Studies (IOIRS) and modified in minor respects to fit the particular taxpayer's situation. In each of the previous cases, the Court has held the purported trust ineffective as a device designed to deflect taxable income from its earner and to create deductions for personal expenses. [2] We reach the same conclusion here. *346 (a) Absence of Economic Reality.
In the words of the court of appeals in Hanson v. Commissioner,696 F.2d 1232, 1234 (9th Cir. 1983), affg. a Memorandum Opinion of this Court, which also involved a family trust created by using IOIRS forms, petitioners' trust "had no economic substance." We acknowledge that income from a trust legally created and administered may not be lightly attributed to the settlor outside of the statutory provisions of sections 671 through 677. However, when the settlor, members of his family, or other closely related persons are trustees and beneficiaries, such trust arrangements must be closely scrutinized for economic substance. Markosian v. Commissioner,73 T.C. 1235, 1245 (1980). That is especially true where the principal source of the income affected by the trust is the personal services of the settlor. Dr. Patterson would have us believe that in creating the trust he stripped himself of all control over all of his property which he valued at $1 million [3]--his home, his medical office, his office equipment, his home furniture and furnishings, other real and personal property, and even his razor, toothbrush, *347 and tennis racket. Yet he continued to live in the same home with the same furnishings, operate his medical practice from the same location, use the same medical equipment, and enjoy the services of the same office staff. There was "no separation of legal title from beneficial enjoyment." Markosian v. Commissioner,supra at 1245. The principal changes effected by the trust were changes in claimed tax consequences. Before the trust was created, Dr. Patterson paid his personal and living expenses from his own bank account and reported as taxable his substantial medical practice income less business deductions. After the trust was created, it reported as its income a sum equal to about two-thirds of Dr. Patterson's medical practice receipts and took deductions for most of the related expenses. In addition, the trust paid and deducted amounts which has been previously treated as personal expenditures, such as expenses for residential upkeep, utilities, and telephone *348 service, homeowners insurance, charitable contributions, and Mrs. Patterson's medical bills. Also, the trust deducted each year depreciation on the trust "headquarters," i.e., petitioners' personal residence. Although Mrs. Patterson, as trustee, signed most of the checks given on the trust's bank account, Dr. Patterson continued from time to time to sign checks on the account as trustee despite, according to the testimony, his resignation as trustee in early 1978. The trust even reported as its income "finders fees" that Dr. Patterson received for assisting in the sale of IOIRS trust packages. The creation of the trust caused no substantial change in Dr. Patterson's medical practice, the family's main income source, or the enjoyment of the property he purportedly conveyed to the trust.[4]
*349 Even the form of the trust arrangement, created in November 1977, was not observed. Markosian v. Commissioner,supra at 1242. The November 2, 1977, agreement, [5] between Dr. Patterson and the trust, quoted in part in our findings, provided that the trust was to lease back to Dr. Patterson the office building, furnishing, equipment and instruments, was to provide various office services and was to receive 20 percent of the doctor' gross income. In 1978, the only full year after the trust's creation for which the record here shows the doctor's income, petitioners' joint return shows total income of $121,165 from the medical practice. Yet the return, as well as the trust's 1978 fiduciary return, shows that Dr. Patterson paid the trust $84,100 in fees; the trust then deducted most of the business and many of petitioner' personal expenses. No witness was able to explain how the $84,100 figure, which far exceeds the agreed 20 percent of gross income, was computed. [6] Evidence that petitioners disregarded the terms of their trust arrangement hardly encourages us to respect it. *350 Further, one of the trust minutes states that one of the duties of the executive trustees was to "reside in THIS Trust HEADQUARTERS in order to best maintain and conserve The Trust's assets." Although Dr. Patterson is alleged to have resigned as a trustee in January 1978, he continued to live in the trust "headquarters" rent-free. (See fn. 4, supra.) At no point in the trial record is there any suggestion that any of the trustees gave any consideration to the sale of the residence and reinvestment of the proceeds in income-producing assets as a means of maximizing the trust income for the benefit of the beneficiaries. Dr. and Mrs. Patterson and their daughter, Pamela, were the trustees during 1977, the first year in controversy. Upon Dr. Patterson's resignation in January 1978, as we have pointed out, he was replaced by Donald Middleton who prepared the income tax returns for the years in issue. Middleton's connection with the management of trust affairs was purely formal. He only attended the annual meeting. Under the the terms of the trust declaration he could have been removed by the other trustees at any time. Pamela Patterson, petitioners' daughter, was 25 years *351 of age in November 1977 and is not shown to have had any business background or experience. Yet Dr. Patterson purportedly turned over to these trustees his entire $1 million fortune and his declaration of trust, quoted in part in our findings, specified that "A Minute of Resolutions of The Board of Trustees authorizing what it is they determine to do or have done shall be evidence that such an act is within their power." Our observation of the witnesses convinces us that Dr. Patterson continued to dominate the trust and control the management of its corpus as completely as he did before the trust was created. We conclude that the trust was a transparent tax avoidance scheme, designed to reduce the income tax on Dr. Patterson's medical practice income and to create tax deductions for personal expenses. Its continued existence and income depended entirely upon Dr. Patterson, who, together with Mrs. Patterson, provided the purported capital contributions and generated virtually all of its income. An entity whose existence, everyday functioning, and ultimate demise are controlled by its creators and which produces no material changes in the status quo, except to reduce income taxes, *352 can only be characterized as a sham, devoid of economic reality. [7]
(b) Grantor Trust Provisions
Alternatively, respondent contends, and we agree, that Dr. and Mrs. Patterson retained such powers over the trust as to require them to be treated as owners thereof under section 677. [8] Where the grantor is so treated, section 671 requires inclusion in the grantor's income "those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust *353 to the extent that such items would be taken into account * * * in computing taxable income or credits against the tax of an individual." Section 677(a) provides in relevant part: (a) General Rule.--The grantor shall be treated as the owner of any portion of a trust * * * whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be-- (1) distributed to the grantor or the grantor's spouse; (2) held or accumulated for future distribution to the grantor or the grantor's spouse; or (3) applied to the payment of premiums on policies of insurance on the life of the grantor or the grantor's spouse * * *. Although Dr. Patterson is described in the trust declaration as the creator and grantor of the trust, Mrs. Patterson transferred to him by quitclaim deed her interest (her community interest, [9] it appears) in the real and personal property that became the trust corpus. This transfer was an integral step in the creation of the trust. Petitioners were, then, co-grantors *354 of the trust. The transfers by Mrs. Patterson to Dr. Patterson were not only intended to form part of a single plan to create one trust for all their property, but in fact, the clear inference is that her transfers were dependent upon Dr. Patterson's subsequent reconveyances over to the trust. The two steps, being part and parcel of a unified plan, may be treated as one, and Mrs. Patterson was a co-grantor of the trust. Schulz v. Commissioner,686 F.2d 490, 496 (7th Cir. 1982), affg. a Memorandum Opinion of this Court; Hanson v. Commissioner,T.C. Memo. 1981-675, fn. 20, affd. per curiam 696 F.2d 1232 (9th Cir. 1983); see also Fergen v. Commissioner,T.C. Memo. 1984-23. *355 During 1977, the first year here in controversy, Dr. and Mrs. Patterson were two of the three trustees of the trust, and the trust declaration provides that "affirmative action" of the trustees may be made by majority vote. They, therefore, had complete control of the trust in 1977. Although Middleton replaced Dr. Patterson as a trustee in January 1978, he was not an "adverse party" within the meaning of section 677(a). Section 672(a) defines the term "adverse party" to mean "any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust." Middleton had no such beneficial interest and thus was not an adverse party. Accordingly, Middleton's appointment did not prevent application of the grantor trust provisions. The trustees were given broad power exercisable for their benefit over the trust's assets and income. Under the terms of the trust declaration and minutes, Dr. and Mrs. Patterson continued to occupy rent-free (see fn. 4, supra) the $450,000 residence they purportedly transferred to the trust, and the trust covered the cost of its repair and maintenance. *356 Dr. and Mrs. Patterson, as executive trustees, were authorized to cause the trust to provide "Adequate life insurance and insurance to cover the cost of medical care." In consideration of their services to the trust, Dr. and Mrs. Patterson as trustees were entitled to payment of all transportation, traveling, selling, office, and entertainment expenses "incident to all trust business" as well as a reasonable monthly consultant fee; these "incidents" could be adjusted, expanded, or deleted as might be expedient. Dr. and Mrs. Patterson were also entitled to remuneration for their services and were authorized to submit statements for their fees. These provisions must be read along with other provisions authorizing the executive trustees "to provide for all contingencies" and stating that "A Minute of Resolutions of the Board of Trustees authorizing what it is they determine to do or have done shall be evidence that such an act is within their power." Under these provisions, it is apparent that Dr. and Mrs. Patterson retained power to distribute the trust income to themselves, hold it for future distribution to them, or apply it to the payment of life insurance premiums within the *357 meaning of section 677(a). 2. Deductibility of Trust Organization Expense
As to the $10,000 paid to IOIRS for the family trust package, the law is settled that petitioners are not entitled to the deduction. Section 212(2) allows a deduction for ordinary and necessary expenses paid or incurred for the "management, conservation, or maintenance of property held for the production of income." The IOIRS expenditure does not fall within that category. It was an expenditure for advice and forms designed to provide for the rearrangement of property and, for this reason, constitutes a nondeductible personal expenditure within the meaning of section 262. Luman v. Commissioner,79 T.C. 846, 857-858 (1982); Epp v. Commissioner,78 T.C. 801, 805 (1982). 3. Addition to Tax
There remains the issue as to the section 6653(a) addition to tax. The record shows that petitioners bought the material to set up the trust without consulting an attorney or a qualified accountant on its tax consequences. Reliance upon such a drastic scheme without seeking competent advice was negligence. The words of the court of appeals in Hanson v. Commissioner,supra at 1234, *358 also involving an IOIRS scheme, are apposite: Good faith reliance on the advice of counsel or a qualified accountant can, under certain circumstances, be a defense to the 26 U.S.C. section 6653(a) addition to tax. * * * However, as a matter of fact the court below found that no lawyer or accountant advised the Hansons that the trust would produce the desired tax advantage. No competent lawyer could. Moreover, the Tax Court found that the Hansons were patently negligent in putting their faith in this "flagrant tax avoidance scheme" repeatedly rejected by the courts. No reasonable person would have trusted this scheme to work. It was obviously without economic substance * * * and was in violation of the grantor trust provisions. [Citation omitted.] The addition to tax is sustained. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Other IOIRS cases are Epp v. Commissioner,78 T.C. 801 (1982) (cost of IOIRS package not deductible); Fergen v. Commissioner,T.C. Memo. 1984-23; Staats v. Commissioner,T.C. Memo. 1983-176; Swayze v. Commissioner,T.C. Memo. 1983-168; Goesch v. Commissioner,T.C. Memo. 1982-650 (correctness of deficiency conceded; imposition of sec. 6653(a) addition to tax sustained); Hicks v. Commissioner,T.C. Memo. 1982-200; Hanson v. Commissioner,T.C. Memo. 1981-675, affd. 696 F.2d 1232↩ (9th Cir. 1983).
3. Dr. Patterson admitted that he filed no gift tax returns showing the purported transfer of this $1 million to the trust or the transfer of the "beneficial interests" referred to in our findings.↩
4. Dr. Patterson testified that he paid monthly rental of $300 to $400 for the residence which, he estimated, had a value of $450,000. Respondent points to the inadequacy of the $300 to $400 monthly rent for such a valuable residence as evidence that the trust was a sham. We are not convinced, however, that Dr. and Mrs. Patterson actually paid the trust any rent for the residence. The doctor's testimony on the point is cast in vague terms--"either $300 or $400"--without any supporting documentation. The fiduciary returns filed by the trust for 1977 and 1978 show no rental income. The monthly ledger sheets on the trust's bank account reflect no regular monthly deposits of $300 or $400. Moreover, as shown by our findings, the minutes of the second meeting of the trustees required petitioners to reside in the trust headquarters. The credible evidence is that no rent was paid.↩
5. This whole plan for the trust to receive and to lease back Dr. Patterson's medical equipment and provide various services was an artificial arrangement. It effected no substantial change in the operation of Dr. Patterson's office. He continued to use the same equipment at the same location with the assistance of the same employees. As far as the evidence goes, the only change in the office management and routine was that, after the trust was created, Mrs. Patterson signed most of the checks covering office expenses. ↩
6. Mrs. Patterson testified that she could not explain the $84,100 figure. Donald Middleton testified that, notwithstanding the 20 percent of "gross income" reference in the agreement, he understood that Dr. Patterson was to pay the trust a sum equal to all of the expenses of his office plus 20 percent of the "adjusted gross." The 1978 fiduciary return shows, however, that Dr. Patterson's office expenses were $44,024; add to that amount 20 percent of the doctor's gross income of $121,165 (or $24,233), and the payment to the trust should have been $68,257. Middleton testified that he could not explain the discrepancy. The close correlation between the trust's reported taxable income ($26,334) and petitioners' remaining medical practice income ($24,956) suggests that the $84,100 figure was the amount that would produce the optimum tax results.↩
7. While we agree with respondent that the trust was a sham for Federal tax purposes, we emphasize that this determination does not mean that petitioners' ostensible goal of avoiding probate of their estates is thwarted. It may well be that, under California law, upon the death of one of the petitioners, the trust arrangement permits the development of his or her property, held as community property prior to the trust's creation, outside probate. This fact, however, does not affect our inquiry into whether the trust is a sham for Federal tax purposes. See Hanson v. Commissioner,T.C. Memo. 1981-675, fn. 17, affd. 696 F.2d 1232↩ (9th Cir. 1983).
8. Basing our decision on sec. 677, we do not consider the applicability of other grantor trust provisions (secs. 673--676).↩
9. The record does not explicitly show that the transferred assets were community assets under California law. However, the Pattersons had been married for several years. When the trust was created in 1977, their daughter, Pamela, was 25 years of age. Thus, it seems reasonably certain that both the real property and personal property were community property. In any event, Mrs. Patterson had some interest in the property; otherwise, there would have been no occasion for the quitclaim deeds.↩