PAUL G. DUBOIS AND ESTATE OF MARY A. DUBOIS, PAUL G. DUBOIS, PERSONAL REPRESENTATIVE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Du Bois v. Commissioner
Docket No. 23857-84.
United States Tax Court
T.C. Memo 1986-160; 1986 Tax Ct. Memo LEXIS 449; 51 T.C.M. (CCH) 895; T.C.M. (RIA) 86160; April 21, 1986. Richard L. Stradley, for the petitioners. Cynthia J. Olson, for the respondent. *451 FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes together with additions to tax as follows: Addition to Tax
Sec. 6651(a),
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
I.R.C. 1954
1980
$18,791
$939
$ 968 1981
$19,749
$ 987 1982
$25,790
$1,290
After certain concessions have been made, the issues for decision are as follows: 1. Whether dividends and interest reported as income by Augie Associates, a purported trust created by petitioners, are taxable to petitioners individually. 2. Whether petitioners have shown that they are entitled to a $3,000 capital loss deduction claimed for 1981. 3. Whether petitioners have shown that their failure to file a timely income tax return for 1980 was due to reasonable cause and not to willful neglect within the meaning of section 6651(a). [1]
4. Whether any part of petitioners' underpayment of tax for 1980, 1981, and 1982 was due to negligence or intentional disregard of the revenue laws within the meaning of section 6653(a). 5. Whether damages should be awarded *452 to the United States under section 6673. FINDINGS OF FACT 1. General
At the time Dr. and Mrs. duBois filed their petition, they were legal residents of Colorado Springs, Colorado. They filed joint Federal income tax returns for 1980, 1981, and 1982. Mrs. duBois died on April 27, 1985, and her estate has been substituted as a party. 2. Trust Issue
Beginning in 1940 and continuing throughout the years at issue, petitioner Paul G. duBois (Dr. duBois) was a medical doctor who practiced his profession in Colorado Springs, Colorado. During 1980 through 1982, Dr. duBois also sold greenhouses through a sole proprietorship. On July 30, 1979, Dr. duBois, as creator and trustee, executed a Declaration of Trust purporting to create a trust entitled Augie Associates (sometimes herein the trust or Associates). In doing so, he used a package of preprinted materials that he had purchased from Aurora Financial Consultants, an organization based in California. Prior to executing the Declaration of Trust or filing the joint income tax returns for 1980, 1981, and 1982, *453 he did not consult an attorney or other professional advisor on the tax consequences of the organization he purported to create. Under date of July 31, 1979, Dr. duBois executed a document entitled "Affidavit General" and other instruments purporting to transfer to the trust certain real property, a Wraparound Deed of Trust, checking and savings bank accounts, stocks, bonds, and other property. One of the instruments was a deed transferring title to the family residence. Another instrument states that Dr. duBois does "assign and convey to Augie Associates in trust, the right to direct that portion of the use of my lifetime personal services which are rendered on behalf of the Aforesaid Trust; and which Trust is to receive all of the earned remuneration resulting therefrom." The same instrument provides that Dr. duBois does "hereby assign and convey to Augie Associates in Trust, the right to direct that portion of the use of the lifetime personal services of Mary G. [sic] duBois, which are rendered on behalf of the Aforesaid Trust; and which Trust is to receive all of the earned remuneration resulting therefrom." Mrs. duBois and a son-in-law, Robert D. Carrothers (Carrothers), *454 were named as the initial trustees. The Declaration of Trust states that approval of a majority of the trustees shall be required before any action can be taken. This provision was made subject, however, to the following provisos: Provided, however, that no funds of the trust shall be accumulated for or distributed to the Trustor or any Transferor or any spouse of the aforementioned as beneficial holders, without the approval of an adverse party Trustee. Provided, also, that no funds of the Trust shall be disbursed to satisfy any legal obligation of the Trustor or any Transferor or any Spouse of the aforementioned, without the approval of an adverse party Trustee. Provided, also, that the following powers and financial Transactions for the benefit of the Trustor or any Transferor or spouse of the aforementioned, are specifically prohibited without the approval of an adverse party trustee: 1) borrowing trust funds without adequate consideration or interest. 2) investing trust funds in Controlled Corporations. 3) substituting other property to reacquire Trust Corpus. 4) Voting of securities in Controlled Corporations. 5) being beneficiaries of or insuring the life of *455 the Trustor or any transferor or spouse of the aforementioned. Following the purported property transfers, Augie Associates issued 200 "beneficial certificates" to members of petitioners' family as follows: Mary A. duBois
90
Paul G. duBois
0
Robert D. Carrothers
20
Mary duBois Carrothers
45
Paul Daniel duBois
45
Mary duBois Carrothers and Paul Daniel duBois were children of Dr. and Mrs. duBois. Dr. duBois intended to, and did, continue in his practice of the medical profession. Under date of July 30, 1979, Dr. duBois and Augie Associates executed a document entitled Agreement which contained the following: In consideration of the terms and the mutual promises and covenents [sic] contained herein, and the other valuable consideration, the receipt of which is hereby acknowledged, it is agreed: 1. The Associates hereby agrees to furnish to the Doctor, office space, furnishings, equipment and instruments as needed in his profession. 2. The Associates shall supply to the Doctor all office supplies and materials reasonably required by the Doctor for the operation of his practice. 3. The Associates shall supply to the Doctor the following *456 personnel for the assistance in the operation of his practice. Secretary-Receptionist-Bookeeper [sic] Registered Laboratory Technician and examination assistant 4. The Associates shall perform all accounting and supervise all billing on behalf of the Doctor. 5. The Doctor, in consideration of the services performed by the Associates, shall pay to the Associates an amount equal to 80 per centum of the gross income of the Doctor's derived from the proceeds of his practice, said amounts to be computed and paid on a monthly basis. 6. The relationship between the parties is that of independant [sic] contractors, no joint venture partnership, or employer-employee relationship is established or implied herein. 7. This agreement may be terminated by either party upon 30 days prior written notice. Under date of August 1, 1979, Dr. and Mrs. duBois signed a document entitled Lease Agreement, whereby Augie Associates purportedly leased the family residence to Dr. and Mrs. duBois on a month-to-month basis at $200 per month. The $200 per month was not ever actually paid. Instead, a bookkeeping entry was made with respect to the rent at the time the joint income tax returns *457 were prepared. On the trust tax returns, deductions were taken with respect to the depreciation and maintenance of the family residence. Carrothers, designated as a trustee, lived in or near Denver, Colorado, approximately 60 miles from Dr. and Mrs. duBois' home. He was never consulted in advance regarding business decisions of the trust and had no way of knowing what action the trust was taking. On his visits to the family in Colorado Springs, he was given general information about the trust and its activities. He never dissented with respect to any action taken by Dr. duBois in handling the trust operations, its income, or its assets. A preprinted minute of a meeting of the trustees on July 31, 1979, states that Dr. duBois was appointed as a trustee on that date and was designated as Executive Trustee. In that capacity, he was given power "to negotiate contracts of any description, buy and sell property of all kinds, to direct the management of any affair that will benefit the Trust, and any other powers provided for in the Trust Indenture." During 1980, 1981, and 1982, petitioners maintained several bank accounts. Respondent served a subpoena on Dr. duBois which directed *458 him to produce all documents pertaining to the operation of the trust and all bank accounts over which either petitioner had signatory authority, or were in the name of either petitioner, or in the name of Augie Associates, for the period January 1, 1979 through December 31, 1982. The only documents produced in response to the subpoena were check registers for two checking accounts, account No. 13-233-4 in the name of Paul G. duBois, M.D., at the American Heritage Bank and Trust Co., Colorado Springs (American Heritage Bank) covering checks numbered 9073 through 9935, dated December 24, 1979 through December 15, 1981, and account No. 287101100 at the First National Bank, also in Colorado Springs, in the name of Augie Associates, Paul G. duBois, Trustee. During 1980, 1981, and 1982, petitioners drew checks on the accounts at the American Heritage Bank and First National Bank accounts for their personal living expenses, including department store purchases, laundry, charitable contributions, payments to the National Commodity and Barter Association, investments in precious metals, medical insurance, grocery bills, and repairs for their automobiles. Dr. duBois, in his sole discretion, *459 made all decisions on what bills would be paid with funds purportedly owned by Augie Associates. Dr. duBois discussed none of the trust expenditures with either one of the other two trustees. Under date of December 31, 1980, the three trustees signed a document entitled Board of Trustees minutes as follows: The following minute or minutes of the Board of Trustees, unless a written dissent appears, were affirmed and ratified. MINUTE NO. 29
All trust activities and decisions for the fiscal year of 1980 had the approval of the majority of the Board of Trustees at the time they were implemented. The financial position of the Trust at the end of the fiscal year 1980, stands approved by a majority of the Board of Trustees. Trust funds have been distributed in accordance with the rules and regulations of the Trust Estate and have been approved by a majority of the members of the Board of Trustees. A review of all Trust activities for the fiscal year stands approved by a majority of the members of the Board of Trustees as shown by their signatures hereon. No distribution of any trust assets were made this year. A similar instrument was signed under date of December 31, 1981, and *460 December 31, 1982. After executing the Agreement with respect to Dr. duBois' medical practice and the Declaration of Trust, petitioners reported on their joint return 20 percent of the income for 1980, 1981, and 1982 from the medical practice and greenhouse sales. All other income (less expenses) from those businesses and from interest, dividends, and the like were reported on Forms 1041, Fiduciary Income Tax Returns, filed in the name of Augie Associates. These amounts were omitted from the Forms 1040, Individual Income Tax Returns, filed by petitioners for those years. In the notice of deficiency, respondent determined that the income reported by Augie Associates was taxable to petitioners on the grounds that the purported trust was a sham and, alternatively, was a grantor trust under sections 671 through 678. In making this determination, respondent allowed petitioners certain itemized expense deductions which had not been claimed on their returns but which had been claimed as deductions on the Augie Associates fiduciary returns, and the parties have stipulated to the allowance of additional amounts of such deductions. The interest and dividend income reported by the trust *461 and determined by respondent to be taxable to petitioners was as follows: Year
Interest
Dividends Less Exclusion
1980
$ 9,090
$3,634
1981
$32,808
$3,721
1982
$32,417
$3,918
3. Capital Loss Issue
In September 1978, Daniel P. duBois (Daniel), a son of petitioners, purchased 6,000 shares of stock in Source Investors Corporation for $14,891. The stock was issued in Daniel's name and remained in his name. The purchase of the stock was not a joint venture with Dr. duBois. The stock did not appear on the list of stocks and bonds which Dr. duBois purported to transfer to Augie Associates in 1979. On their return for 1981, petitioners claimed a capital loss with respect to this stock, and in the notice of deficiency the claimed loss was disallowed. 4. Additions to Tax
Petitioners filed their 1980 income tax return on May 5, 1981, whereas it was due on April 15, 1981. Respondent determined that petitioners are liable for an addition to tax under section 6651(a) for 1980. Respondent also determined that petitioners was liable for additions to tax under section 6653(a) for all 3 years in controversy. OPINION 1. The Trust *462 Issue
Respondent contends that Augie Associates lacked economic substance and reality and was a sham. Pointing to duBois v. Commissioner,T.C. Memo. 1980-143, in which Dr. and Mrs. duBois contended that the Fifth Amendment accorded them the right to refuse to file a tax return and report their income for 1976, respondent contends, in substance, that petitioners are here continuing their frivolous tax protester arguments, basing them for 1980, 1981, and 1982 on the family trust technique. Petitioners conceded at trial that they are taxable on Dr. duBois' medical practice and greenhouse sales income but maintain that the trust effectively shields them from tax on dividends and interest derived from property allegedly transferred to the trust. They contend that the provisions in the declaration of trust requiring the approval of an adverse party, Robert D. Carrothers, for designated types of transactions render the grantor trust provisions (secs. 671 through 678) inapplicable and give the trust economic reality. In weighing respondent's argument that the trust was a sham, it is necessary to consider all of the facts of record. The facts relating to the dividends *463 and interest cannot be isolated from the facts relating to the medical practice and the greenhouse sales. The entire plan for the trust, its purposes, operations and economic consequences, must be taken into account. The burden of proof, of course, rests with petitioners to show that the disputed income was not taxable to them. Rule 142(a)[2]; Welch v. Helvering,290 U.S. 111 (1933). Petitioners have relied almost exclusively upon the signing of the preprinted package of trust organization documents and the oral testimony of Dr. duBois and Carrothers to carry that burden. Although Dr. duBois was subpoenaed to produce books of account, ledger sheets, journals, and other records that would have thrown light on the operations of the trust and the source and disposition of the interest and dividend income in dispute, he produced nothing except the check registers on two bank checking accounts. Dr. duBois testified that he was unable to find any other subpoenaed records among his files, but he took no steps to obtain pertinent records from banks, brokers, or other sources to enable him to respond to the subpoena or to carry his burden of proof. *464 As a direct result of Dr. duBois' failure to produce the requested documents, the evidence shows neither the source nor the disposition in detail of the interest and dividend income in dispute. It is true, as stated in our findings, that Dr. duBois executed an instrument entitled "Affidavit General" by which he purported to transfer to the trust certain items of property. Some of the items were described in terms which indicate that they had the potential for producing interest and dividends, but no evidence was offered to show that the properties described in the Affidavit General were the properties that produced the income here in dispute. Nor is there any evidence as to what became of either the dividend or interest income. The evidence does indicate that there were two bank checking accounts--one at the American Heritage Bank and the other at the First National Bank--in which, according to the testimony, trust income was deposited. As discussed below, we infer that the disputed interest and dividends were deposited in those accounts. The question is whether the deposits of those funds in the two accounts relieved petitioners of income tax on such amounts. *465 The answer depends on the economic realities, the substance and not merely the form, of what was done. The courts and the Congress have long recognized that trusts are easily susceptible of manipulation so as to create illusion. See, e.g., Knetsch v. United States,364 U.S. 361, 365-366 (1960); Golsen v. Commissioner,54 T.C. 742, 756 (1970), affd. 445 F.2d 985 (10th Cir. 1971); Lazarus v. Commissioner,58 T.C. 854, 864 (1972), affd. 513 F.2d 824 (9th Cir. 1975). "When the form of the transaction has not, in fact, altered any cognizable economic relationships, we will look through that form and apply the tax law according to the substance of the transaction. Furman v. Commissioner,45 T.C. 360 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967)." Markosian v. Commissioner,73 T.C. 1235, 1241 (1980). When we examine the facts, we find that the execution of the preprinted package of trust papers did not change the economic realities. Although Dr. duBois purported to transfer practically all of his property and the fruits of his lifetime services to the trust, *466 Mrs. duBois and Carrothers, his son-in-law, immediately made him executive trustee and conferred on him virtually unlimited control over the trust property. Dr. duBois purported to transfer the family residence to the trust; however, he and Mrs. duBois continued to occupy and use the residence in the same manner as before. When they filled out their tax returns, Dr. and Mrs. duBois made a bookkeeping entry each year with respect to rent on the residence and through the trust deducted the otherwise nondeductible personal expenses of maintaining the home. [3] See Schulz v. Commissioner,686 F.2d 490, 492-493 (7th Cir. 1982), affg. a Memorandum Opinion of this Court. Dr. duBois purportedly transferred to the trust all facilities for his medical practice and his lifetime services, and the trust agreed to provide needed space, furnishings, equipment, instruments, personnel, and supplies. But nothing actually changed except that, for income tax purposes, the trust reported 80 percent (less expenses) of his medical practice and greenhouse sales income and Dr. and Mrs. duBois reported only the other 20 percent. Under this arrangement, the family's income tax could be computed *467 under the lowest possible bracket of the graduated rates. [4]
*468 The record contains only the check registers and oral testimony with respect to the checking accounts at the American Heritage Bank and the First National Bank. The record shows nothing with respect to the balances at the end or the beginning of the periods at issue. The evidence shows that Dr. and Mrs. duBois used those accounts as if they were personal rather than trust accounts--to pay clothing, grocery, laundry, recreation, utility, maid service, and other personal bills as well as to cover political and charitable contributions. Dr. duBois admitted that receipts from his medical practice and greenhouse sales, all of which were purportedly assigned to the trust, were deposited in these two bank accounts. Because no other trust bank accounts were shown to have been maintained, we infer that the disputed interest and dividends were also deposited in the same accounts. The trial record does not show that any books of account or other records were kept to segregate personal from trust income or expenses. There is no evidence to show that the full amount of the interest and dividend income was not spent by Dr. and Mrs. duBois during each of the years at issue. [5] The signing *469 of the preprinted package of trust papers thus caused no substantive change whatever in the production or use of the family's income and resources. Markosian v. Commissioner,73 T.C. at 1243-1244; Patterson v. Commissioner,T.C. Memo. 1984-339. Petitioners make much of the fact that the Declaration of Trust forbids the distribution of trust funds to the trustor or his spouse without the approval of an "adverse party trustee." They point out that the papers signed in July 1979 named Carrothers a trustee of Augie Associates *470 and gave him 10 percent of the units of beneficial interest issued by the trust. In this manner, they contend that they have avoided the application of the grantor trust provisions of sections 671 through 678 and that, in this respect, Augie Associates differs from the many family trusts that have been denied tax effect. On this ground, they argue that the trust must be recognized. There are several answers to petitioner's argument. Sections 671 through 678, the grantor trust provisions, are "provisions for taxing to the grantor the income of a trust over which he has retained substantial dominion and control." S. Rept. No. 1622, 83d Cong., 2d Sess. 364 (1954); Paxton v. Commissioner,520 F.2d 923, 927 (9th Cir. 1975), affg. 57 T.C. 627 (1972); cf. Laganas v. Commissioner,281 F.2d 731, 735 (1st Cir. 1960), affg. in part and revg. and remanding in part a Memorandum Opinion of this Court. Technical compliance with the formalities of those sections, however, does not preclude a decision, in an extreme case like this one, that there is such lack of economic reality as to nullify the existence of a trust for income tax purposes. *471 S. Rept. No. 1622, 83d Cong., 2d Sess. 365 (1954); Furman v. Commissioner,45 T.C. 360, 366 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967). Such technical compliance with those sections does not breathe economic reality into an arrangement which causes no substantive change in the taxpayer's relationship to the trust property. Moreover, section 677(a) coupled with section 671 requires the disputed interest and dividend income to be taxed to petitioners because that income was distributed to Dr. and Mrs. duBois. Section 677(a) provides: (a) General Rule.--The grantor shall be treated as the owner of any portion of a trust * * * whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be (1) distributed to the grantor or the grantor's spouse * * * Section 671 provides that where a grantor is treated as the owner of any portion of a trust, the income of that portion is taxable to him. We have concluded above that the interest and dividend income was deposited in the American Heritage Bank and First National Bank accounts and that the deposits in those *472 accounts were used by Dr. and Mrs. duBois for personal and family purposes. This personal use of the funds in those accounts constituted distributions, within the meaning of section 677(a), to Dr. and Mrs. duBois to the same extent as if the trustees had formally authorized distributions of trust income. [6] Carrothers was never consulted regarding the distributions or, if he was, he acquiesced in what was done. Carrothers was a trustee in name only. Naming him as *473 trustee was part of the facade designed to create the illusion that Dr. and Mrs. duBois relinquished control over the trust property. Carrothers lived 60 miles away, visited Colorado Springs only occasionally, and exercised no judgment over trust matters. Notwithstanding the free and unrestricted use of the purported trust funds by Dr. and Mrs. duBois and the 1981 distribution reported on the trust's fiduciary return, he testified that "To my knowledge there was never any[thing] done that required my consent." He also signed annual minutes for all three years in controversy stating that "No distribution of any trust assets were made this year." Designating him as a trustee was a pure formality. [7]
*474 We conclude that the trust was a transparent tax avoidance scheme, a sham, designed to reduce Dr. duBois' income taxes on his substantial medical practice, greenhouse sales, and investment income by shifting part of that income to the trust and creating deductions for personal expenses. From the record before us, we find that the trust had no economic reality or effect. Its creation did not change Dr. duBois' relationship to his property or the income it produced. Dr. and Mrs. duBois signed the preprinted package of trust orgaization materials and preprinted annual minutes but did little, if anything else, to give life and vitality to the trust. It was a sham. Zmuda v. Commissioner,731 F.2d 1417, 1420-1421 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Holman v. United States,728 F.2d 462, 464 (10th Cir. 1984); Hanson v. Commissioner,696 F.2d 1232, 1234 (9th Cir. 1983), affg. a Memorandum Opinion of this Court; Markosian v. Commissioner,73 T.C. 1235, 1245 (1980). 2. The Capital Loss Issue
Petitioners have claimed a capital loss deduction with respect to the sale of stock purchased and held *475 in the name of Daniel P. duBois, the son of Dr. and Mrs. duBois. Again, we have no documentary or other evidence, such as the canceled checks used to purchase the stock or the deposit slip covering the proceeds of its sale. Daniel admitted that his father had given him other stock in the past, and the brokerage house's statement of the transaction did not reflect that Dr. duBois had any interest in the stock. We hold that petitioners have failed to carry their burden of proof on this issue. 3. Addition to Tax under Section 6651(a)(1)
Section 6651(a)(1) provides for the imposition of an addition to tax if the taxpayer fails to file a timely return unless such failure was due to reasonable cause and not willful neglect. Dr. and Mrs. duBois' 1980 return was due April 15, 1981, and they filed it May 5, 1981. They offered no evidence to show why the return was not timely filed. Because the burden of proof rested with petitioners, Rule 142(a), we sustain the determined addition to tax under section 6651(a)(1). 4. Addition to Tax under Section 6653(a)
Section 6653(a) provides for an addition to tax if any part of the underpayment was due to negligence or intentional *476 disregard of the revenue laws. The underpayments in this case stem mainly from the creation of Augie Associates, the purported trust which we have found to be a sham. Dr. duBois admitted that he did not consult an attorney or accountant or anyone else other than the people who sold him the trust papers package on the tax effectiveness of the trust arrangement. We find that petitioners have not carried their burden of showing the absence of either negligence or intentional disregard of the revenue laws. We sustain the section 6653(a) addition to tax. See, e.g., Holman v. United States,728 F.2d at 465; Hanson v. Commissioner,696 F.2d at 1234. 5. Liability for Damages
Section 6673 permits this Court to award damages not in excess of $5,000 if it finds that proceedings before it have been instituted or maintained primarily for delay or that the taxpayer's position in such proceedings is groundless or frivolous. We have found that the Augie Associates trust was a sham, and numerous basically similar cases have been decided by this Court and the courts of appeals. However, in addition to the trust issue, the capital loss issue is presented. *477 Also, in the notice of deficiency, respondent in determining that the trust was a sham allowed petitioners only a portion of the business expenses incurred in Dr. duBois' medical practice. At the trial, the parties stipulated that petitioners are entitled to additional deductions. Because issues other than the family trust issue are presented, we do not think section 6673 damages should be awarded in this case. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. All Rule references are to the Tax Court Rules of Practice and Procedures unless otherwise indicated.↩
3. With respect to the family residence, Augie Associates' 1982 fiduciary return shows that the trust, purportedly as lessor, deducted depreciation of $2,492 and the following "Other Expenses": Security
$ 420
Taxes
1,110
Insurance
550
Repairs
2,483
Utilities
2,435
Maintenance, cleaning, laundry
4,030
Supplies
2,184
Small equipment
586
$13,798
The trust scheme was thus designed to enable petitioners to make these and other "consumptive expenditures with pre-tax dollars." Schulz v. Commissioner,686 F.2d 490, 493↩ (7th Cir. 1982), affg. a Memorandum Opinion of this Court. 4. Through their control over the trust, Dr. and Mrs. duBois made bookkeeping entries designed to keep at a minimum the bracket applicable to each return. We have pointed out that a bookkeeping entry was made each year for the rent of the family residence and the trust took deductions for its upkeep. The 1981 joint return shows a $6,876 distribution from the trust and the 1981 fiduciary return shows a deduction for distributions in the same amount, leaving a tax liability of $196 on the joint return and zero liability on the fiduciary return. The return shows this distribution even though trust minutes recite that no trust distributions were made in 1981.↩
5. Dr. duBois' failure to produce any records on the sources and disposition of the interest and dividends and the vagueness of his testimony on the whole subject lead to the inference that any records that might have been produced would not have been consistent with the position he here advocates. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); Karme v. Commissioner,73 T.C. 1163, 1186 n. 18 (1980), affd. 673 F.2d 1062 (9th Cir. 1981; Patterson v. Commissioner,T.C. Memo. 1984-339↩.
6. Sec. 677(a) was intended primarily to apply to tax income to a grantor "by reason of a power to vest the income in him or to apply it to his benefit." S. Rept. No. 1622, 83d Cong., 2d Sess. 371 (1954). Nonetheless, the section covers the situation where the distribution is made to the grantor or his spouse. S. Rept. No. 1622, 83d Cong., 2d Sess. 364 (1954). If, for any reason, the section does not apply here, under the findings we have made the interest and dividends would be taxable to petitioners as income received under a claim of right, North American Oil v. Burnet,286 U.S. 417 (1932), or as income diverted from the trust, James v. United States,366 U.S. 213, 219↩ (1961).
7. When asked what position he held with the trust, Carrothers answered "Adverse trustee." He testified that he participated in the "business" of the trust. On being asked what was the business of the trust, he replied, "I understood it to be more to protect the assets of the trust, mom and dad's assets." He was then asked against what were the assets to be protected and he answered: Well, against--say, Dad got a little crazy and wanted to go pull a bunch out and go to Vegas. I couldn't allow him to do that. Or--there's several things. Anything that would endanger that mass. Like if he just wanted to pull something out of the trust and say it is not in the trust * * *. How Carrothers was to do this while living in Denver, 60 miles away, and having given virtually all control over the trust, its bank accounts, and other assets to Dr. duBois as executive trustee is far from clear.↩